## UNITED STATES *v.* JOHNSON.

No. 25.   Argued November 10 and 15, 1965.—
Decided February 24, 1966.

*Beatrice Rosenberg* argued the cause for the United States. With her on the briefs were *Solicitor General Marshall, Assistant Attorney General Vinson, Ralph S. Spritzer* and *Jerome M. Feit.*

*George Cochran Doub* and *David W. Louisell* argued the cause and filed a brief for respondent.

*Eugene Gressman* and *Edward L. Genn* filed a brief for J. Kenneth Edlin, as *amicus curiae,* urging affirmance.

MR. JUSTICE HARLAN delivered the opinion of the Court.

Respondent Johnson, a former United States Congressman, was indicted and convicted on seven counts of violating the federal conflict of interest statute, 18 U. S. C. § 281 (1964 ed.),[1] and on one count of conspiring to

---

[1] "Whoever, being a Member of or Delegate to Congress, . . . directly or indirectly receives or agrees to receive, any compensation for any services rendered or to be rendered, either by himself or another, in relation to any proceeding, contract, claim, contro-

defraud the United States, 18 U. S. C. § 371 (1964 ed.).[2] The Court of Appeals for the Fourth Circuit set aside the conviction on the conspiracy count, 337 F. 2d 180, holding that the Government's allegation that Johnson had conspired to make a speech for compensation on the floor of the House of Representatives was barred by Art. I, § 6, of the Federal Constitution which provides that "for any Speech or Debate in either House, they [Senators and Representatives] shall not be questioned in any other Place." The Court of Appeals ordered a new trial on the other counts, having found that the evidence adduced under the unconstitutional aspects of the conspiracy count had infected the entire prosecution.

The conspiracy of which Johnson and his three co-defendants were found guilty consisted, in broad outline, of an agreement among Johnson, Congressman Frank Boykin of Alabama, and J. Kenneth Edlin and William L. Robinson who were connected with a Maryland savings and loan institution, whereby the two Congressmen would exert influence on the Department of Justice to obtain the dismissal of pending indictments of the loan company and its officers on mail fraud charges. It was further claimed that as a part of this general scheme Johnson read a speech favorable to independent savings

---

versy, charge, accusation, arrest, or other matter in which the United States is a party or directly or indirectly interested, before any department, agency, court martial, officer, or any civil, military, or naval commission, shall be fined not more than $10,000 or imprisoned not more than two years, or both; and shall be incapable of holding any office of honor, trust, or profit under the United States."

[2] "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

and loan associations in the House, and that the company distributed copies to allay apprehensions of potential depositors. The two Congressmen approached the Attorney General and the Assistant Attorney General in charge of the Criminal Division and urged them "to review" the indictment. For these services Johnson received substantial sums in the form of a "campaign contribution" and "legal fees." The Government contended, and presumably the jury found, that these payments were never disclosed to the Department of Justice, and that the payments were not bona fide campaign contributions or legal fees, but were made simply to "buy" the Congressman.

The bulk of the evidence submitted as to Johnson dealt with his financial transactions with the other conspirators, and with his activities in the Department of Justice. As to these aspects of the substantive counts and the conspiracy count, no substantial question is before us. 18 U. S. C. § 371 has long been held to encompass not only conspiracies that might involve loss of government funds, but also "any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government." *Haas* v. *Henkel,* 216 U. S. 462, 479. No argument is made, nor do we think that it could be successfully contended, that the Speech or Debate Clause reaches conduct, such as was involved in the attempt to influence the Department of Justice, that is in no wise related to the due functioning of the legislative process. It is the application of this broad conspiracy statute to an improperly motivated speech that raises the constitutional problem with which we deal.[3]

---

[3] Only the question of the applicability of the Speech or Debate Clause to the prosecution of Johnson is before us. The Court of Appeals affirmed the convictions of co-defendants Edlin and Robinson whose appeals were consolidated with that of Johnson and,

## I.

The language of the Speech or Debate Clause clearly proscribes at least some of the evidence taken during trial. Extensive questioning went on concerning how much of the speech was written by Johnson himself, how much by his administrative assistant, and how much by outsiders representing the loan company.[4] The government attorney asked Johnson specifically about certain

---

except for a brief as *amicus curiae* submitted by Edlin, questions raised in those cases have not been presented to us. The defendant Boykin took no appeal from his conviction.

[4] See direct examination by the prosecution of Martin Heflin, App. 182–191, esp. 189–190:

"Q. What, if anything, did Congressman Johnson do with the material which Mr. Robinson brought in and gave to him? A. As I recall, Mr. Johnson said that his administrative assistant . . . would go over the material, too and if I am not mistaken, Mr. Johnson called him in and Buarque took the material and I left the office with Mr. Buarque to discuss it some more.

.          .          .          .          .

"Q. After that meeting did you at any time thereafter have any contact either with Congressman Johnson or his office with regard to the speech? A. I telephoned a time or two there and I think I was called by Mr. Buarque and asked him about certain figures that the Institute—background material that might be supplied, and I did supply additional material and I believe Mr. Buarque sent me a draft, himself, with certain places, blank places for figures to be filled in. We had a discussion about some of the technical phases [*sic*] and information, statistical information and so forth.

"Q. You supplied some of the facts and figures for the draft that Mr. Buarque sent you? A. Yes.

"Q. What did you do with that draft once you had looked it over? A. Returned it."

See also cross-examination of Manual Buarque, App. 488–494; cross-examination of co-defendant Robinson, App. 772–775; cross-examination of defendant Johnson, Transcript 79–93.

sentences in the speech, the reasons for their inclusion and his personal knowledge of the factual material supporting those statements.[5]   In closing argument the

---

[5] See cross-examination of Johnson, Transcript 84–86:

"Q. And did you not tell Mr. Heflin when he came to see you in your office after that luncheon that he should work with Mr. Buarque on the preparation of the speech which was ultimately given on June 30?   A. My statement is the same as it has always been that Mr. Heflin came to my office, representing himself as a public relations man, for a certain institute of Independent Savings and Loan Associations.   He had the article of one of the local newspapers.   A very unfair attack which he claimed had been made on savings and loans.   He talked with me a very short time. I told him that Mr. Buarque, my administrative assistant, did all of my writing, all of the conversations and if there were any answers to be made,—he went out with me to the next room, met Mr. Buarque and I left the two together.

. . . . .

"Q. You told him, did you not, that he should work with Mr. Buarque on the matter since Mr. Buarque prepared your speeches? A. I told him at the time to discuss it with Mr. Buarque and any arrangements Mr. Buarque wanted to make, why, he, of course, would be cooperative with him.

. . . . .

"Q. Now, you say that at that time—I assume you meant at the time of the speech—that one savings association meant nothing more to you than another.   Is that what you referred to?   A. Not only then but following the speech, too.

"Q. I believe you testified on direct examination that you did not know the name of First Continental Savings and Loan or First Colony Savings and Loan at the time this speech was delivered on June 30, is that your testimony?   A. I think my testimony is that one name did not mean more than another.

. . . . .

"Q. Now, your speech was finally delivered or submitted to the clerk and it was printed in the Congressional Record, and it stresses the value of commercial mortgage guaranty insurance, does it not? A. I think it has a reference to it, yes.

"Q. Isn't it a fact that at the time of the speech, First Continental and First Colony were the only independent savings and loan associations in the State of Maryland which carried commer-

theory of the prosecution was very clearly dependent upon the wording of the speech.[6] In addition to questioning the manner of preparation and the precise in-

cial mortgage guaranty insurance? A. I have no knowledge of that and did not know at the time.

"Q. You have no knowledge of that? A. None, whatever.

"Q. As a matter of fact, that language in your speech, Congressman, was a part of the language which Mr. Edlin emphasized in his reprint, was it not? A. May I say that I did not see any of the so-called 'reprints.'"

And see Transcript 91:

"Q. Congressman, do you mean to tell the jury that Mr. Buarque put that language in the speech about three indicted institutions and none convicted, and you did not inquire as to which particular institutions they were? A. He did not tell me which they were, the names.

"Q. Well, let me ask you this: How could you, if you did not know which institutions were under indictment, how could you make this statement in your speech:

"'I personally do not know any of these institutions nor any of the circumstances leading to their respective indictments. I hold no brief for any of them, one way or another.'

"That is the language of your speech, is it not? A. Yes, I said that is the prepared speech which had been testified that Mr. Buarque with some help from Heflin, prepared."

[6] See Oral Argument on behalf of the Government, Transcript 232–248, esp. 244–245:

"I submit to you members of the jury, there is no other logical explanation you can make but that that speech was made solely for the purposes of Mr. Kenneth Edlin. It was a day's work for a day's pay for the man to whom he was selling his Congressional Office and his Congressional influence.

"Congressman Johnson has claimed on the stand in this case that he did not then know that the First Colony Savings and Loan Association was then under indictment.

"Now, you will recall the language in the speech, itself, that out of 400 independent savings and loan associations in Maryland, exactly three of them have been indicted and none convicted.

"[']Personally, I do not know any of these indicted institutions

gredients of the speech, the Government inquired into
the motives for giving it.[7]

The constitutional infirmity infecting this prosecution
is not merely a matter of the introduction of inadmis-
sible evidence. The attention given to the speech's sub-
stance and motivation was not an incidental part of the
Government's case, which might have been avoided by

---

nor any of the circumstances leading to their respective indictments.
I hold no brief for any of them one way or the other.[']

"Congressman Johnson claimed under oath, Members of the
Jury, that he did not even bother to check the facts to ascertain
whether he could truthfully make such a statement in his speech.

"If so, I submit to you, it was utterly and completely irresponsible
and reprehensible, but the Government submits that that is not
so and that that was not a fact. The Government submits that
Congressman Johnson did know at that time that both First Colony
and Mr. Edlin were then under indictment in this very Court and
that he, nevertheless made those statements in the speech which
he delivered on June 30, 1960.

"Those statements, Members of the Jury, the Government submits
were completely untrue and deceitful."

[7] See, e. g., cross-examination of Johnson, Transcript 79–81:

"Q. Now, Congressman, you told Mr. Estabrook on December
20, 1961, in London, did you not, that this speech had been made
at the urging of several of your own people or of your own con-
stituents? Is that not a fact? A. Which conference are you
speaking of with Mr. Estabrook?

. . . . .

"Q. As a matter of fact, then, except for Mr. Buarque, whom
you term a constituent, no constituent of yours ever spoke to you
about making that speech on the floor of the House of Congress,
is that not correct? A. It could be. I do not recall.

"Q. You would be—you would not deny it? A. No.

"Q. Is it not a fact that prior to that speech Congressman, you
had never discussed savings and loan programs or problems with
any of your constituents on the Eastern Shore of Maryland? A. Oh,
I think possibly I had. I do not know to what degree but I want
to say too, that the speech you refer to there was a motivation
that Mr. Buarque testified that I was interested in a statewide
election for the Senate in 1964."

omitting certain lines of questioning or excluding certain evidence. The conspiracy theory depended upon a showing that the speech was made solely or primarily to serve private interests, and that Johnson in making it was not acting in good faith, that is, that he did not prepare or deliver the speech in the way an ordinary Congressman prepares or delivers an ordinary speech. Johnson's defense quite naturally was that his remarks were no different from the usual congressional speech, and to rebut the prosecution's case he introduced speeches of several other Congressmen speaking to the same general subject, argued that his talk was occasioned by an unfair attack upon savings and loan associations in a Washington, D. C., newspaper, and asserted that the subject matter of the speech dealt with a topic of concern to his State and to his constituents. We see no escape from the conclusion that such an intensive judicial inquiry, made in the course of a prosecution by the Executive Branch under a general conspiracy statute, violates the express language of the Constitution and the policies which underlie it.

## II.

The Speech or Debate Clause of the Constitution was approved at the Constitutional Convention without discussion and without opposition. See V Elliot's Debates 406 (1836 ed.); II Records of the Federal Convention 246 (Farrand ed. 1911). The present version of the clause was formulated by the Convention's Committee on Style, but the original vote of approval was of a slightly different formulation which repeated almost verbatim the language of Article V of the Articles of Confederation: "Freedom of speech and debate in Congress shall not be impeached or questioned in any court, or place out of Congress . . . ." The language of that Article, of which the present clause is only a slight modification, is in turn almost identical to the English Bill of Rights of 1689:

178

"That the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament." 1 W. & M., Sess. 2, c. 2.

This formulation of 1689 was the culmination of a long struggle for parliamentary supremacy. Behind these simple phrases lies a history of conflict between the Commons and the Tudor and Stuart monarchs during which successive monarchs utilized the criminal and civil law to suppress and intimidate critical legislators.[8] Since the Glorious Revolution in Britain, and throughout United States history, the privilege has been recognized as an important protection of the independence and integrity of the legislature. See, *e. g.,* Story, Commentaries on the Constitution § 866; II The Works of James Wilson 37–38 (Andrews ed. 1896). In the American governmental structure the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders. As Madison noted in Federalist No. 48:

> "It is agreed on all sides, that the powers properly belonging to one of the departments, ought not to be directly and compleatly administered by either of the other departments. It is equally evident, that neither of them ought to possess directly or indirectly, an overruling influence over the others in the administration of their respective powers. It will not be denied, that power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it. After discriminating therefore in theory, the several classes of power, as they may in their nature be legislative,

[8] See generally C. Wittke, The History of English Parliamentary Privilege (Ohio State Univ. 1921); Neale, The Commons' Privilege of Free Speech in Parliament, in Tudor Studies (Seton-Watson ed. 1924).

executive, or judiciary; the next and most difficult task, is to provide some practical security for each against the invasion of the others. What this security ought to be, is the great problem to be solved." (Cooke ed.)

The legislative privilege, protecting against possible prosecution by an unfriendly executive and conviction by a hostile judiciary, is one manifestation of the "practical security" for ensuring the independence of the legislature.

In part because the tradition of legislative privilege is so well established in our polity, there is very little judicial illumination of this clause. Clearly no precedent controls the decision in the case before us. This Court first dealt with the clause in *Kilbourn* v. *Thompson,* 103 U. S. 168, a suit for false imprisonment alleging that the Speaker and several members of the House of Representatives ordered the petitioner to be arrested for contempt of Congress. The Court held first that Congress did not have power to order the arrest, and second that were it not for the privilege, the defendants would be liable. The difficult question was whether the participation of the defendants in passing the resolution ordering the arrest was "speech or debate." The Court held that the privilege should be read broadly, to include not only "words spoken in debate," but anything "generally done in a session of the House by one of its members in relation to the business before it." 103 U. S., at 204.

In *Tenney* v. *Brandhove,* 341 U. S. 367, at issue was whether legislative privilege protected a member of the California Legislature against a suit brought under the Civil Rights statute, 8 U. S. C. §§ 43, 47 (3) (1946 ed.), alleging that the legislator had used his official forum "to intimidate and silence plaintiff and deter and prevent him from effectively exercising his constitutional

rights of free speech and to petition the Legislature for redress of grievances . . . ." 341 U. S., at 371. The Court held a dismissal of the suit proper; it viewed the state legislative privilege as being on a parity with the similar federal privilege, and concluded that

> "The claim of an unworthy purpose does not destroy the privilege. . . . The holding of this Court in *Fletcher* v. *Peck,* 6 Cranch 87, 130, that it was not consonant with our scheme of government for a court to inquire into the motives of legislators, has remained unquestioned." 341 U. S., at 377.

### III.

*Kilbourn* and *Tenney* indicate that the legislative privilege will be read broadly to effectuate its purposes; neither case deals, however, with a criminal prosecution based upon an allegation that a member of Congress abused his position by conspiring to give a particular speech in return for remuneration from private interests. However reprehensible such conduct may be, we believe the Speech or Debate Clause extends at least so far as to prevent it from being made the basis of a criminal charge against a member of Congress of conspiracy to defraud the United States by impeding the due discharge of government functions. The essence of such a charge in this context is that the Congressman's conduct was improperly motivated, and as will appear that is precisely what the Speech or Debate Clause generally forecloses from executive and judicial inquiry.

Even though no English or American case casts bright light on the one before us [9] it is apparent from the history

---

[9] Compare *The King* v. *Boston,* 33 Commw. L. R. 386 (Austl. 1923); *The Queen* v. *White,* 13 Sup. Ct. R. 322 (N. S. W. 1875); *Regina* v. *Bunting,* 7 Ont. 524 (1885), for commonwealth cases dealing with the general question of liability of legislators for bribery in distinguishable contexts. See 78 Harv. L. Rev. 1473, 1474.

of the clause that the privilege was not born primarily of a desire to avoid private suits such as those in *Kilbourn* and *Tenney,* but rather to prevent intimidation by the executive and accountability before a possibly hostile judiciary. In the notorious proceedings of King Charles I against Eliot, Hollis, and Valentine, 3 How. St. Tr. 294 (1629), the Crown was able to imprison members of Commons on charges of seditious libel and conspiracy to detain the Speaker in the chair to prevent adjournment.[10] Even after the Restoration, as Holdsworth noted, "[t]he law of seditious libel was interpreted with the utmost harshness against those whose political or religious tenets were distasteful to the government." VI Holdsworth, A History of English Law 214 (1927). It was not only fear of the executive that caused concern in Parliament but of the judiciary as well, for the judges were often lackeys of the Stuart monarchs,[11] levying punishment more "to the wishes of the crown than to the

---

[10] The court in that case attempted to distinguish between the true privilege and unlawful conspiracies:

"And we hereby will not draw the true Liberties of Parliament-men into question; to wit, for such matters which they do or speak in a parliamentary manner. But in this case there was a conspiracy between the Defendants to slander the state, and to raise sedition and discord between the king, his peers, and people; and this was not a parliamentary course.

.     .     .     .     .

"That every of the Defendants shall be imprisoned during the king's pleasure: Sir John Elliot to be imprisoned in the Tower of London, and the other Defendants in other prisons." 3 How. St. Tr., at 310.

See the account in Taswell-Langmead's English Constitutional History (Plucknett ed. 1960), at 376–378. After the Restoration, some 38 years after the trial, Parliament resolved that the judgment "was an illegal judgment, and against the freedom and privilege of Parliament." The House of Lords reversed the convictions in 1668. See Taswell-Langmead, *supra,* at 378, note 55.

[11] See Holdsworth, *supra,* at 503–511.

gravity of the offence." *Id.*, at 214–215. There is little doubt that the instigation of criminal charges against critical or disfavored legislators by the executive in a judicial forum was the chief fear prompting the long struggle for parliamentary privilege in England and, in the context of the American system of separation of powers, is the predominate thrust of the Speech or Debate Clause. In scrutinizing this criminal prosecution, then, we look particularly to the prophylactic purposes of the clause.[12]

The Government argues that the clause was meant to prevent only prosecutions based upon the "content" of speech, such as libel actions, but not those founded on "the antecedent unlawful conduct of accepting or agreeing to accept a bribe." Brief of the United States, at 11. Although historically seditious libel was the most frequent instrument for intimidating legislators, this has never been the sole form of legal proceedings so employed,[13] and the language of the Constitution is framed

[12] Compare *Thornhill* v. *Alabama,* 310 U. S. 88, and *New York Times Co.* v. *Sullivan,* 376 U. S. 254, for expressions of the central importance to our political system of uninhibited political expression as guaranteed to the general populace by the First and Fourteenth Amendments.

[13] See, *e. g., Strode's Case,* one of the earliest and most important English cases dealing with the privilege. In 1512, Richard Strode, a member of Commons from Devonshire, introduced a bill regulating tin miners which appears to have been motivated by a personal interest. He was prosecuted in a local Stannary Court, a court of special jurisdiction to deal with tin miners, for violating a local law making it an offense to obstruct tin mining. He was sentenced and imprisoned. Parliament released him in a special bill, declaring "That suits, accusements, condemnations, executions, fines, amerciaments, punishments, corrections, grievances, charges, and impositions, put or had, or hereafter to be put or had, unto or upon the said Richard, and to every other of the person or persons afore specified that now be of this present Parliament, or that of any Parliament hereafter shall be, for any bill, speaking, reasoning, or declaring of

in the broadest terms. The broader thrust of the privilege is indicated by a nineteenth century British case, *Ex parte Wason*, L. R. 4 Q. B. 573 (1869), which dealt specifically with an alleged criminal conspiracy. There a private citizen moved that a magistrate be required to prosecute several members of the House of Lords for conspiring wrongfully to prevent his petition from being heard on the floor. The court denied the motion, stating that statements made in the House "could not be made the foundation of civil or criminal proceedings . . . . And a conspiracy to make such statements would not make the person guilty of it amenable to the criminal law." *Id.*, at 576. (Cockburn, C. J.) Mr. Justice Lush added, "I am clearly of opinion that we ought not to allow it to be doubted for a moment that the motives or intentions of members of either House cannot be inquired into by criminal proceedings with respect to anything they may do or say in the House." *Id.*, at 577.

---

any matter or matters concerning the Parliament to be communed and treated of, be utterly void and of none effect." 4 Hen. 8, c. 8, as reproduced in Tanner, Tudor Constitutional Documents 558, 559 (2d ed. 1930); see Taswell-Langmead, *supra,* at 248–249. During the prosecution of Sir John Eliot in 1629 it was argued that Strode's Act applied to all legislators, but the court held that it was a private act. 3 How. St. Tr. 294, 309. In 1667 both Houses of Parliament declared by formal resolutions that Strode's Act was a general law, "And that it extends to indemnify all and every the Members of both Houses of Parliament, in all Parliaments, for and touching all Bills, speaking, reasoning, or declaring of any Matter or Matters in and concerning the Parliament, to be communed and treated of, and is only a declaratory law of the antient and necessary Rights and Privileges of Parliament." I Hatsell, Precedents of Proceedings in the House of Commons 86–87 (1786); see Taswell-Langmead, *supra,* at 378, note 55. The central importance of Strode's case in English constitutional history is persuasive evidence that the parliamentary privilege meant more than merely preventing libel and treason prosecutions.

In the same vein the Government contends that the Speech or Debate Clause was not violated because the gravamen of the count was the alleged conspiracy, not the speech, and because the defendant, not the prosecution, introduced the speech itself.[14] Whatever room the Constitution may allow for such factors in the context of a different kind of prosecution, we conclude that they cannot serve to save the Government's case under this conspiracy count. It was undisputed that Johnson delivered the speech; it was likewise undisputed that Johnson received the funds; controversy centered upon questions of who first decided that a speech was desirable, who prepared it, and what Johnson's motives were for making it. The indictment itself focused with particularity upon motives underlying the making of the speech and upon its contents:

> "(15) It was a part of said conspiracy that the said THOMAS F. JOHNSON should . . . render services, for compensation, . . . to wit, the making of a speech, defending the operations of Maryland's 'independent' savings and loan associations, the financial stability and solvency thereof, and the reliability and integrity of the 'commercial insurance' on investments made by said 'independent' savings and loan associations, on the floor of the House of Representatives." App. 5–6.

We hold that a prosecution under a general criminal statute dependent on such inquiries necessarily contra-

---

[14] The Government, however, did introduce a reprint of the speech in its case-in-chief, in order to show how the co-conspirators made use of it. Certain portions were shown to be outlined in red because, as the prosecution's witness testified, "these were the points most pertinent to what we were trying to put across and for ease in the person's reading it." App. 259. The use of a copy of the speech in this context necessarily required the jury to read those portions and to reflect upon its substance.

venes the Speech or Debate Clause. We emphasize that our holding is limited to prosecutions involving circumstances such as those presented in the case before us. Our decision does not touch a prosecution which, though as here founded on a criminal statute of general application, does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them. And, without intimating any view thereon, we expressly leave open for consideration when the case arises a prosecution which, though possibly entailing inquiry into legislative acts or motivations, is founded upon a narrowly drawn statute passed by Congress in the exercise of its legislative power to regulate the conduct of its members.[15]

The Court of Appeals' opinion can be read as dismissing the conspiracy count in its entirety. The making of the speech, however, was only a part of the conspiracy charge. With all references to this aspect of the conspiracy eliminated, we think the Government should not be precluded from a new trial on this count, thus wholly purged of elements offensive to the Speech or Debate Clause.

## IV.

The Court of Appeals held that Johnson was entitled to a new trial on the conflict of interest counts because the admission of evidence concerning the speech aspect of the conspiracy count was prejudicial on these other counts as well. The Government reserved the right to contest the order of a new trial, but, except for a footnote in its reply brief, it did not so argue in this Court; on the contrary it stated in oral argument that it stood solely on its position with reference to the conspiracy

---

[15] Cf. Note, The Bribed Congressman's Immunity from Prosecution, 75 Yale L. J. 335, 347–348 (1965).

count.[16] In these circumstances we find no occasion to review the Court of Appeals' assessment of the record in this respect.

For the foregoing reasons we affirm the judgment of the Court of Appeals and remand the case to the District Court for further proceedings consistent with this opinion.                                    *It is so ordered.*

MR. JUSTICE BLACK took no part in the decision of this case.

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

MR. CHIEF JUSTICE WARREN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN join, concurring in part and dissenting in part.

I concur in the limited holding of the Court that the use of the Congressman's speech during this particular trial—with an examination into its authorship, motiva-

---

[16] In oral argument, government counsel stated as follows:

"And so the question that we brought to the Court, and the only question that we think is properly involved in this case now, revolves around the taking of money to give a speech on the floor of Congress."

Question from the Bench: "Well, was there [to be] a new trial on the other phase of it?"

Government Counsel: "It [the Court of Appeals] ordered a new trial on the other phase. And we have not brought that issue here. We reserved it in our petition but we did not argue it, I might say largely because it cannot be determined without reading the whole record. The question in this case which we did bring here, and which we think is the question involved, is this: Article 1, Section 6, of the Constitution provides that for any speech or debate in either House, no member of Congress shall be questioned in any other place. And as we view it, the question is, does that Speech or Debate Clause mean that Congress is without power under the Constitution to make it a crime triable in court for a Congressman to take money to make a speech?"

tion and content—was violative of the Speech or Debate Clause. I also join the Court in its remand of the conspiracy count for a new trial, this time purged of offensive matter. The Court's refusal to decide the validity of the conviction under the seven substantive counts, however, prompts me to dissent. In my view, the conflict of interest counts are properly before us, raise important questions and should be resolved now since the respondent will probably raise these issues on his forthcoming reprosecution.

## I.

The Court explains its refusal to reach the substantive counts by referring to a single statement made by the Government's counsel at the outset of oral argument, p. 186, n. 16, *ante*. In the same colloquy, the Government remarked that it did not consider the issues raised by the substantive counts to be of general importance, and felt that the question of the effect of the tainted evidence on these counts would unavoidably require an examination of the entire 1,300-page record. Prior to oral argument, the Government had argued these issues exhaustively in the Court of Appeals, and had mentioned them in its petition for certiorari in compliance with Supreme Court Rule 40 (1)(d)(1) and (2), and in its reply brief on the merits. Both in its reply brief and later in oral argument, in answer to inquiries from the Bench, it contended that the evidence, arguments and instructions on the conspiracy count were distinct from the substantive counts. At best, then, the Government's position is ambiguous, if not puzzling.[1] Beyond that,

---

[1] I confess to some surprise that the Government almost abandoned these issues when in this Court, even though the major question in the case is the application of the Speech or Debate Clause. In the first place, this Court has not had occasion to deal with the conflict of interest statutes as applied to a Member of Congress

the respondent himself specifically urged this Court to consider the issues in his brief on the merits, pp. 100–101 and n. 86, devoted 33 pages of argument to this phase of the case and addressed himself to the questions on oral argument. Under these unique circumstances, I think it is our duty carefully to scrutinize all the facts and issues involved in the prosecution.

## II.

After reading the record, it is my conclusion that the Court of Appeals erred in determining that the evidence concerning the speech infected the jury's judgment on the substantive counts. The evidence amply supports the prosecution's theory and the jury's verdict on these counts—that the respondent received over $20,000 for attempting to have the Justice Department dismiss an indictment against his co-conspirators, without disclosing his role in the enterprise. This is the classic example of a violation of § 281 by a Member of the Congress.[2] See *May* v. *United States,* 175 F. 2d 994, 1006 (C. A. D. C. Cir.); *United States* v. *Booth,* 148 F. 112, 117 (Cir. Ct. D.

---

since 1906, *Burton* v. *United States,* 202 U. S. 344, and they remain viable although lately revised, see Manning, Federal Conflict of Interest Law 14–73 (1964). Moreover, the Government itself has argued strenuously and successfully in many cases that an erroneous conviction on one count does not vitiate a conviction on other counts, especially where concurrent sentences are involved, see, *e. g.,* *United States* v. *Romano,* 382 U. S. 136; *United States* v. *Gainey,* 380 U. S. 63, 65; *Sinclair* v. *United States,* 279 U. S. 263, 299; *Barnard* v. *United States,* 342 F. 2d 309 (C. A. 9th Cir.), certiorari denied, 382 U. S. 948. There are, in addition, numerous cases in which the issue was raised in this Court and the petitioner-defendant was denied certiorari.

[2] The sentence given was lenient—six months on each count, but all to run concurrently. The conspiracy statute, 18 U. S. C. § 371, authorizes a five-year prison term and a $10,000 fine, and the conflict of interest statute in effect at the trial permitted a two-year sentence and a $10,000 fine for each violation, 18 U. S. C. § 281.

Ore.). The arguments of government counsel and the court's instructions separating the conspiracy from the substantive counts seem unimpeachable. The speech was a minor part of the prosecution. There was nothing in it to inflame the jury and the respondent pointed with pride to it as evidence of his vigilance in protecting the financial institutions of his State. The record further reveals that the trial participants were well aware that a finding of criminality on one count did not authorize similar conclusions as to other counts, and I believe that this salutary principle was conscientiously followed. Therefore, I would affirm the convictions on the substantive counts.