946 F.2d 887
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Gareth David BLEVINS, Defendant-Appellant.
 No. 90-5114.
 United States Court of Appeals, Fourth Circuit.
 Submitted May 17, 1991.
Decided Oct. 3, 1991.
 
 Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. John T. Copenhaver, Jr., District Judge. (CR-90-136-2)
 Edward H. Weis, Assistant Federal Public Defender, Charleston, W.Va., for appellant.
 Michael W. Carey, United States Attorney, Phillip B. Scott, Assistant United States Attorney, Charleston, W.Va., for appellees.
 S.D.W.Va.
 AFFIRMED.
 Before WIDENER and WILKINS, Circuit Judges, and CHAPMAN, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Gareth David Blevins was convicted by a jury of one count of interstate transportation of stolen property in violation of 18 U.S.C. §§ 2314 & 2. At the sentencing hearing, the district court determined that there was no basis for downward departure under the Sentencing Reform Act and sentenced Blevins to eighteen months imprisonment and fines. Blevins appeals the conviction based on remarks made in closing argument, and the sentence based on the district court's refusal to depart downward. Because we conclude that there was no plain error in the closing argument, we affirm the conviction. We also conclude that there was no basis in law for a downward departure, and therefore affirm the sentence.
 
 
 2
 Blevins was a joint owner with Johnny Porter of Bruin Trucking, which hauled and mined coal. Porter and his sister also owned a separate company, Mutual Mining, which often shared equipment with Bruin. In December 1989, Mutual had several pieces of equipment, including bulldozers, on its job site at Island Creek, in Holden, West Virginia.
 
 
 3
 Johnny Porter was in charge of the equipment and business end of the contract with Island Creek and Blevins generally ran errands for parts and arranged for the moving of equipment to and from the job site. It was the custom for Mutual to employ Bryant Trucking to move equipment and to pay for its services by check upon receipt of an invoice after the work was completed.
 
 
 4
 On Saturday, December 8, 1989, Blevins made arrangements to have equipment moved the following Monday morning. Blevins and one of Bryant's drivers, Ronnie Burke, arranged to meet at 2:00 Monday morning. Nighttime moves of equipment are not uncommon in the industry: equipment is often moved without a permit and nighttime is best for avoiding traffic and police.
 
 
 5
 Burke was told to load a Caterpillar D8N bulldozer from the Island Creek site, rather than from Mutual's mine site. The area at the Island Creek site was very dark and there were no lights. Blevins turned the tractor lights off and drove the bulldozer up to the lowboy with the bulldozer lights off. He did turn the bulldozer lights on to load it onto the lowboy.
 
 
 6
 After the bulldozer was loaded, Blevins, without telling him where they were going, eventually led Burke to a location just outside of Salyersville, Kentucky. There they unloaded the bulldozer in an area behind a gas station, where heavy equipment was frequently parked.
 
 
 7
 Blevins then told Burke to go to Phelps, Kentucky, to one of Mutual's job sites to move a grease truck to the Holden site. He gave Burke $40 to purchase gas for the truck and to buy breakfast. When Burke met up with Blevins later in the day, he attempted to return the $40 since the truck did not need gas. Blevins refused and told Burke to keep it. According to the testimony, Blevins told Burke not to tell anyone about moving the bulldozer and to have Bryant bill him separately for the bulldozer job. Later, Bryant was paid $500 in cash for the job.
 
 
 8
 When he returned to work that day, Blevins appeared nervous. He told no one about the bulldozer move. The bulldozer was discovered missing by Island Creek officials Monday morning and was discovered in Salyersville two days later.
 
 
 9
 In April 1990, Blevins admitted to an FBI special agent his having taken the bulldozer. However, he contended that there was a misunderstanding about the circumstances surrounding the move and that he thought he had "clearance" to move it. Though Blevins stated that Porter would be able to clear everything up, he would not say how. He also admitted paying cash to Bryant, but explained that he was told by Bryant that the charge would be $300 more if he paid other than by cash.
 
 
 10
 At trial, the United States submitted evidence of Blevins's financial situation. Blevins had purchased Porter's father's (Charles) fiftypercent share of Bruin for $250,000. A portion of the purchase was financed by Charles Porter's taking a note from Blevins. The company made little, if any, money for about two and a half years and Blevins made no payments on the note. In November 1989, the elder Porter had decided to call his note on this interest. Blevins also had a $60,000 note payable to the Bank of Mays Lick, due on or before December 10, 1989. The case presented by the United States was that Blevins stole the bulldozer, valued at $150,000, to cover these debts.
 
 
 11
 Defense counsel argued that the circumstances surrounding the move indicated that Blevins did not believe he did anything wrong. Therefore, he lacked the requisite intent. Specifically, defense pointed to the use of individuals who knew Blevins to assist in the move and Blevins's return to work after the alleged theft. Counsel also argued that Johnny Porter had a motive to tell Blevins to move the bulldozer to a job site with which Blevins was not familiar while falsely telling him that he had permission. In other words, the theory of the defense was that Porter was attempting to set up Blevins so that the Porters would regain exclusive control of the business.
 
 
 12
 The main issue left open for the jury was whether Blevins had the criminal intent necessary to return a guilty verdict.
 
 
 13
 In rebuttal argument, the United States attempted to expose Blevins's defense:
 
 
 14
 MR. FARRELL: ... Ladies and gentlemen, let me remind you, the only evidence you are to consider is the evidence you've heard from this chair, not what I have said or the other counsel have said. If your memory is different from what I have said or what the other attorneys have said you rely on your memory because that's important in this case because I think Mr. Weis has spent, as his client did in statements prior to trial, has misdirected us. He has wanted us not to look at the defendant. He doesn't want you to say this gentleman stole the bulldozer. He doesn't want you to say that. He doesn't want you to think that. And it's like teaching a child to play baseball. The most important thing you tell that child is you have to keep your eye on the ball. If you are going to hit that ball with that bat, you have got to keep your eye on it. In this case, I ask you to keep your eye on the defendant because he is the one that stole this bulldozer. That is the only conclusion you can draw because the evidence from this stand has been unrefuted. Nobody has said anything to the contrary.
 
 
 15
 The defendant did not object to any portion of the rebuttal at trial.
 
 
 16
 A presentence report was prepared. It showed that Blevins had a negative net worth of--$15,000 but a positive monthly cash flow of $1,158. The offense level was 13 and the Criminal History Category was I. Therefore, under the Sentencing Reform Act, he was subject to a term of imprisonment between 12-18 months and a fine of between $3,000 to $30,000.
 
 
 17
 Blevins requested a downward departure based on the fact that, if he was incarcerated, he would not be able to earn money to pay off his debts. Therefore, innocent creditors would be financially harmed. The court refused to consider this argument as a grounds for departure as to imprisonment but would consider it as to fines. The sentence Blevins eventually received was at the high end with regard to the prison term, and at the low end with regard to the potential fines. At sentencing, the court noted its limited discretion in sentencing and stated that "there is no basis for downward departure under the law."
 
 
 18
 I. Closing argument. The standard of review of the alleged error in closing argument is quite narrow, since no objection was made at trial. See United States v. Young, 470 U.S. 1, 15 (1985) (reversal appropriate only if the error is of such magnitude that it "seriously affect[ed] the fairness, integrity or public reputation" of the trial, or if failure to correct the error would result in a "miscarriage of justice").
 
 
 19
 When a defendant chooses not to testify, the fifth amendment prohibits the prosecutor, judge, or counsel for a codefendant from making any direct adverse comment on the defendant's refusal to take the stand. Griffin v. California, 380 U.S. 609 (1965). The test used for indirect remarks is, "was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." United States v. Whitehead, 618 F.2d 523, 527 (4th Cir.1980) (citations omitted). See also United States v. Lorick, 753 F.2d 1295, 1298 (4th Cir.), cert. denied, 471 U.S. 1107 (1985). We conclude that the closing remarks in this case would not reasonably be taken by a juror as a comment on the lack of testimony by the accused.
 
 
 20
 The mere fact that the prosecutor commented that the evidence was unrefuted does not constitute an improper comment. United States v. Jenkins, 544 F.2d 180 (4th Cir.1976) (failure of defense to object at trial, coupled with judge's instruction that no inferences were to be drawn from defendant's failure to testify, led to conclusion of no plain error), cert. denied, 431 U.S. 931 (1977); United States v. Williams, 479 F.2d 1138 (4th Cir.), cert. denied, 414 U.S. 1025 (1973).
 
 
 21
 When a defendant is the only witness who could contradict the evidence, reference to the evidence as uncontradicted may raise constitutional questions. See Gaskins v. McKellar, 916 F.2d 941 (4th Cir.1990); United States v. Percy, 765 F.2d 1199 (4th Cir.1985); United States v. Johnson, 337 F.2d 180, 203 (4th Cir.1964), aff'd, 383 U.S. 169 (1966). Where, as here, however, the defendant is not the only person who could counter the prosecution's evidence, referring to the evidence as uncontradicted does not necessarily constitute an impermissible comment on the failure of the defendant to take the stand. Id. Blevins could have submitted indirect evidence to refute the intent, such as someone testifying that there was some good faith reason for Blevins to move the bulldozer. This would not be unreasonable, especially in light of the fact that the prosecution was required to prove intent in this way.
 
 
 22
 Furthermore, the instructions to the jury were sufficient to cure any error. As noted by appellee, the jury was instructed three different times concerning the fact that a defendant has no duty to produce evidence. First, they were told that a defendant is never required to produce evidence. Second, they were told that the jury was not required to accept uncontradicted evidence. Finally, they were cautioned that the weight of the evidence is not determined by the number of witnesses called by either side. Additionally, they were explicitly instructed to draw "no inference of any kind" from the fact that the defendant did not testify. On these facts, we find no plain error in the prosecutor's comments which would warrant reversal of Blevins's conviction.
 
 
 23
 II. Sentencing. Blevins is challenging the district court's refusal to depart downward in order that he may work and satisfy his creditors. While a refusal to depart is not reviewable on appeal, United States v. Meitinger, 901 F.2d 27 (4th Cir.1990); United States v. Bayerle, 898 F.2d 28 (4th Cir.1990), remand is proper where the court wrongly believed it could not depart. United States v. Wilson, 896 F.2d 856, 859 (4th Cir.1990). Blevins is objecting to the sentencing court's statement that "it is not within the court's discretion in this instance, inasmuch as there is no basis for downward departure under the law, to sentence [him] to other than a sentence within those guidelines." Hence, jurisdiction to review the sentence is proper if Blevins can show that it was based on the sentencing court's misinterpretation of its authority to depart. Bayerle, 898 F.2d at 31.
 
 
 24
 The law is well settled that a downward departure in order to accommodate a defendant's need to make money is improper. First, the guidelines themselves state that "[e]mployment record is not ordinarily relevant in determining whether a sentence should be outside the guidelines or where within the guidelines a sentence should fall." U.S.S.G. § 5H1.5. In addition, the defendant's family responsibilities are not to be considered. U.S.S.G. § 5H1.6. More importantly, this Court has held that "personal financial difficulty may not, under even extraordinary circumstances ... support a downward departure." United States v. Deigert, 916 F.2d 916, 919 n. 2 (4th Cir.1990) (referring to U.S.S.G. § 5K2.12); see also United States v. McHan, 920 F.2d 244, 247 (4th Cir.1990) (rejection of significant charitable contributions to community as a basis for downward departure).
 
 
 25
 In United States v. Bolden, 889 F.2d 1336 (4th Cir.1989), this Court rejected the argument that a downward departure in the term of the prison sentence was warranted to permit defendant to make restitution to victims of his scheme to defraud. The Court suggested that its holding was not limited to restitution.
 
 
 26
 We do not perceive any factors present in Bolden's case that would reasonably warrant a downward departure from the sentencing range set forth in the guidelines. If incarcerated, under conditions that would render him unable to work, Bolden is no different from any other person convicted of a similar offense. Both would be unable to work; it is not unlikely that both would be discharged; without earned income both would be hindered or prevented from making restitution. Similarly, we do not think that the fact that Bolden has made some restitution, ... and promises to make future restitution is any justification to adjust downward the minimum sentence of confinement set forth in the guidelines.
 
 
 27
 Id. at 1340-41 (footnote omitted).
 
 
 28
 Because the district court correctly concluded that there was no legal basis for a downward departure in this case, we affirm the sentence.
 
 
 29
 III. Conclusion. We conclude that the comments by the prosecutor in closing argument did not constitute an impermissible reference to Blevins's failure to testify. Even if they did, reversal would not be warranted in this case. In addition, the refusal of the sentencing court to depart from the sentencing guidelines was not in error. Hence, we affirm both the conviction and the sentence.
 
 
 30
 We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and argument would not aid the decisional process.
 
 
 31
 AFFIRMED.