**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

STEVEN D. WHITENER,
Plaintiff-Appellant,

v.

DAVID McWATTERS, Loudoun
County Supervisor, Broad Run
District; SCOTT K. YORK, Loudoun
County Supervisor, Sterling District;
JOAN G. ROKUS, Loudoun County
Supervisor, Leesburg District;
ELEANORE C. TOWE, Loudoun

County Supervisor, Blue Ridge
District; JAMES G. BURTON, Loudoun
County Supervisor, Mercer District;
LAWRENCE S. BEERMAN, II, Loudoun
County Supervisor, Dulles District;
DALE POLEN MYERS, Chairman at
Large; HELEN A. MARKUM, Loudoun
County Supervisor, Catoctin
District,
Defendants-Appellees.

No. 96-1515

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, District Judge.
(CA-96-117-A)

Argued: January 27, 1997

Decided: April 30, 1997

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Niemeyer wrote the majority opinion, in which Judge Murnaghan joined. Judge Motz wrote a dissenting opinion.

_____

## COUNSEL

**ARGUED:** John Henry Partridge, Herndon, Virginia, for Appellant. William Joseph Carter, CARR, GOODSON, LEE & WARNER, Washington, D.C., for Appellees. **ON BRIEF:** Samuel J. Smith, Jr., CARR, GOODSON, LEE & WARNER, Washington, D.C.; John David Grad, GRAD, LOGAN & KLEWANS, P.C., Alexandria, Virginia, for Appellees.

_____

## OPINION

NIEMEYER, Circuit Judge:

When the Loudoun County (Virginia) Board of Supervisors disciplined one of its members for confronting other members with abusive language, the disciplined member filed suit in federal court under 42 U.S.C. § 1983, alleging that the Board violated his First Amendment and procedural due process rights. The district court dismissed the complaint, concluding that the Board members enjoyed absolute legislative immunity. Because we hold that a legislative body's discipline of one of its members is a core legislative act, we affirm.

I

Following their election on November 17, 1995, the nine members of the Loudoun County Board of Supervisors met in anticipation of their four-year term, which was to begin on January 1, 1996. During the meeting, they conducted a "straw vote" to determine committee membership, and they gave each other assurances that at the first official meeting of the Board on January 3, 1996, they would vote in accordance with the straw vote. For unexplained reasons, at the January 3 meeting certain members, including Joan Rokus and Eleanore Towe, voted differently from the straw vote with the result that cer-

2

tain committee chairmanships were given to others than had been indicated by the straw vote.

Steven Whitener, a member adversely affected by the change, was shocked and became incensed with the breach. After the January 3 meeting, he confronted Rokus privately and reprimanded her, questioning her integrity and trustworthiness. Likewise, two days later, he called Towe to reprimand her. Both Rokus and Towe claim that Whitener's conversations with them exceeded the bounds of decency and civility. Rokus reported Whitener to say that "she shouldn't have let us (the Supervisors who had honored their commitments from the straw vote) all sit up there and be f___ed by her when we were counting on her to keep her word." And Whitener does not deny making the statement.

When Rokus and Towe complained to the full Board about Whitener's unseemly behavior and requested that Whitener be punished for his abusive language, the Board appointed a three-member ad hoc ethics committee to investigate the complaint and make recommendations. The committee met on January 26, 1996, and, after a contentious meeting where testimony was given and arguments made, voted 2-1 to recommend that Whitener "be formally censured for a period of [one year] and that the rules of order be changed to remove him from all standing committees of [the] Board as well as all assignments and appointments to outside committees, commissions, etc." On consideration of the ad hoc committee's recommendation, the Board voted 8-1 to censure Whitener and 5-4 to strip him of his committee assignments for a period of one year.

After the ad hoc committee made its recommendation but before the full Board of Supervisors had acted on it, Whitener filed suit against the other eight members of the Board under 42 U.S.C. § 1983, alleging, among other things, that the Board violated his First Amendment and procedural due process rights. He requested that the court enjoin the Board from disciplining him. The defendant Board members filed a motion to dismiss, asserting legislative immunity, and the district court granted the motion. It concluded:

> In legislative immunity cases involving local jurisdictions where the challenged action is administrative, such as the

3

firing of an employee, legislative immunity may not apply. However, when the challenged activity concerns a core legislative function, immunity does apply.

This case concerns the vote of the Board of Supervisors in policing its own ethics violations, obviously a core legislative activity. The plaintiff complains of an action by the board to strip him of committee and commission assignments for his conduct in confronting other members of the board and his use of abusive language. Plaintiff may not challenge legislative voting or inquire as to why votes were made. The plaintiff is asking the Court to enjoin the defendants from voting in ways he believes are detrimental to him. This brings the case directly into the bar of legislative immunity.

Whitener v. McWatters, No. 96-117-A, slip op. at 4 (E.D.Va. Mar. 8, 1996).

II

Whitener contends that he harbored an unpopular opinion "regarding the voting conduct" of Board members; that he expressed such opinion to two members; and that "he was punished. . . for expressing his minority opinions, under the guise that he had somehow engaged in `abusive speech'." He argues that this is "precisely the type of scenario that the First and Fourteenth Amendments were designed to prevent, and to which the doctrine of absolute legislative immunity has never been applied." Arguing particularly that the district court erred in applying legislative immunity to this case, he maintains (1) that the Board of Supervisors did not act in a legislative capacity, but rather in an administrative or judicial one, and (2) that, in any event, legislative immunity does not apply to protect legislators acting in a manner that directly abridges his constitutional rights. The resolution of these issues is a matter of law that we consider de novo. See Alexander v. Holden, 66 F.3d 62, 65 (4th Cir. 1995).

None of the parties appears to challenge the threshold legal principle that absolute legislative immunity applies similarly to federal, state, and local legislative bodies. In Tenney v. Brandhove, 341 U.S.

4

367, 376 (1951), the Supreme Court held that state legislators were cloaked with absolute immunity for their legislative actions, and the Court extended that protection to members of a regional political subdivision in Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 405 (1971). We analogously applied principles of legislative immunity to members of a county council in Bruce v. Riddle, 631 F.2d 272, 279 (4th Cir. 1980). As we summarized in Bruce, "if legislators of any political subdivision of a state function in a legislative capacity, they are absolutely immune from being sued under the provisions of § 1983." Id.

Whitener contends, however, that the discipline imposed by the Loudoun County Board of Supervisors was not legislative because it was neither prospective nor general, but rather administrative or judicial because it applied both retrospectively and specifically to him and only him. To maintain that his discipline was not a legislative act and therefore not protected by immunity, he relies heavily on our decisions in Alexander and Roberson v. Mullins, 29 F.3d 132 (4th Cir. 1994). In both Alexander and Roberson county employees, who had been dismissed by their county boards, sued their boards for the improper termination of their employment. In both cases, we held that discharging a county employee was an administrative or executive act which did not engage the county's legislative function and therefore was not protected by legislative immunity. We noted that legislative action typically involves the promulgation of prospective, general rules, rather than actions taken against specified individuals. See Alexander, 66 F.3d at 66; Roberson, 29 F.3d at 135.

In contrast to the factual circumstances presented in Alexander and Roberson, however, the challenged action before us involves a local legislative body disciplining one of its elected members, not an employee. Even though Whitener relied upon Roberson and Alexander to argue that the Loudoun County Board had not acted in a legislative capacity, to address the distinguishing facts of this case he appears to argue that the Board, in disciplining one of its members, functioned in a judicial capacity. He states, "Appellees' decision to punish Appellant on the basis of the content of his speech was more like a judicial . . . act." This argument, however, provides Whitener with no comfort because judicial functions are also protected by absolute immunity. See Butz v. Economou, 438 U.S. 478, 511-12 (1978)

5

(finding administrative law judge within executive department entitled to absolute immunity); Brown v. Griesenauer , 970 F.2d 431 (8th Cir. 1992) (giving local legislators absolute immunity for judicial action of holding impeachment proceedings against mayor).

While Whitener may not derive persuasive support from Alexander and Roberson, the question remains whether a legislative body disciplining one of its members acts in a legislative capacity so as to enjoy absolute immunity in courts of law. Because the nature and scope of legislative immunity "has [its] taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries," Tenney, 341 U.S. at 372, we can review the development of the immunity to inform our conclusion.

As the English House of Commons matured from a meek body, empowered only to petition the king, into a body itself responsible for the text of laws, debate within the House became increasingly important. With increased debate, the Speaker of the House changed his "plea [to the king] for forgiveness" for uttering words displeasing to the king into a general and more assertive petition for parliamentary free speech. See David S. Bogen, The Origins of Freedom of Speech and Press, 42 Md. L. Rev. 429, 432 (1983). At the same time, the House of Commons began to punish its members who interfered with parliamentary functions. See id. Over time, members of Parliament claimed the right of free speech during parliamentary sessions and the exclusive right to punish such speech, while the king continued to maintain that the protection of speech in Parliament was merely a royally dispensed privilege. See id. at 432-33. He continued to claim the right to punish "seditious" parliamentary speech. See id.; Sources of Our Liberties 234 (Richard L. Perry et al., eds., (1991) (hereafter Sources).

When Parliament attained supremacy after the Glorious Revolution, it clarified many points of law with the English Bill of Rights of 1689. See Sources, at 223. Among the clarifications,

> the said lords spiritual and temporal, and commons .. . do in the first place (as their ancestors in like cases have usually done) . . . declare . . . 9. That the freedom of speech, and debates or proceedings in parliament, ought not to be

6

> impeached or questioned in any court or place out of
> parliament.

Bill of Rights of 1689, 1 W. & M., sess. 2, c. 2, art. 9, quoted in Sources, at 246-47 (emphasis added). In establishing that members' speech should not be questioned "in any court or place out of parliament," Parliament simultaneously denied the crown's authority and asserted its own power to punish members' speech. Indeed, "[t]he primary function of the privilege had been to limit jurisdiction to punish." Bogen, Origins, at 437. The Parliamentary privilege did not relieve a member of accountability for speech, because his colleagues could censure him for abuses. Id. at 436. Instead, the privilege was intended to "prevent intimidation by the executive and accountability before a possibly hostile judiciary." United States v. Johnson, 383 U.S. 169, 181 (1966).

Colonial assemblies followed Parliament's lead and successfully asserted the freedom of legislative speech as so understood. See Bogen, Origins, at 433 (citing M. Clarke, Parliamentary Privilege in the American Colonies 62 (1971)); see, e.g., Mass. Const. of 1780, Part 2, art. XXI ("The freedom of deliberation, speech, and debate, in either house of the legislature, is so essential to the rights of the people, that it cannot be the foundation of any accusation or prosecution, action, or complaint, in any other court or place whatsoever." (Emphasis added)). Indeed, in Virginia, where the Loudoun County Board of Supervisors sits, "the assemblies had built up a strong tradition of [the] legislative privilege long before the Revolution." Tenney, 341 U.S. at 374 n.3; see also Va. Const. art. IV, § 9. When the several colonies came together under the Articles of Confederation, the privilege was restated in language similar to that of the English Bill of Rights:

> Freedom of speech and debate in Congress shall not be
> impeached or questioned in any Court, or place out of
> Congress, and the members of congress shall be protected
> in their persons from arrests and imprisonments, during the
> time of their going to and from, and attendance on congress,
> except for treason, felony, or breach of the peace.

Articles of Confederation and Perpetual Union art. V, cl. 5 (emphasis added).

7

Finally, with the ratification of the Constitution, it was again confirmed that "for any Speech or Debate in either House, [the representatives and senators] shall not be questioned in any <u>other Place</u>." U.S. Const. art. I, § 6, cl. 1 (emphasis added). The Constitution also enumerates for Congress the power, long asserted by Parliament, to "punish its Members for disorderly Behavior, and, with the Concurrence of two thirds, expel a Member." U.S. Const. art. I, § 5, cl. 2. Commenting on the power to punish members, Joseph Story said:

> No person can doubt the propriety of the provision authorizing each house to determine the rules of its own proceedings. If the power did not exist, it would be utterly impracticable to transact the business of the nation, either at all, or at least with decency, deliberation, and order. <u>The humblest assembly of men is understood to possess this power</u>; and it would be absurd to deprive the councils of the nation of a like authority. But <u>the power to make rules would be nugatory, unless it was coupled with a power to punish for disorderly behavior</u>, or disobedience to those rules.

Joseph Story, <u>Commentaries on the Constitution of the United States</u> § 419 (emphasis added).

Thus, Americans at the founding and after understood the power to punish members as a legislative power inherent even in "the humblest assembly of men." <u>Id</u>. This power, rather than the power to exclude those elected, is the primary power by which legislative bodies preserve their "institutional integrity" without compromising the principle that citizens may choose their representatives. <u>See Powell v. McCormack</u>, 395 U.S. 486, 548 (1969) (holding Congress' power to judge qualifications of members-elect limited to enumerated qualifications); <u>see also</u> U.S. Const. art. I, § 5, cl. 2 (granting the power to expel only by two-thirds vote). Further, because citizens may not sue legislators for their legislative acts, legislative bodies are left to police their own members. Absent truly exceptional circumstances, it would be strange to hold that such self-policing is itself actionable in a court.

This history and long practice confirm that the disciplinary action taken by the Loudoun County Board of Supervisors against one of its

8

members was legislative in nature. And Whitener's own contentions confirm that his conduct was legislative. He alleges that he harbored an unpopular voting position on the Board; that he expressed his position using abusive language; and that the Board disciplined him for it. While he was arguably disciplined for speech, it was legislative speech, which is protected from executive or, in the United States, judicial interference, but not from the legislative body's judgment. As legislative speech and voting is protected by absolute immunity, the exercise of self-disciplinary power is likewise protected.

III

Whitener contends that even if the Board of Supervisors' action were taken in a "legislative capacity," absolute immunity should not apply because the Board's censure of him "directly abridge[d] . . . [his] constitutional rights." He claims support for this broad assertion from Bond v. Floyd, 385 U.S. 116 (1966). The holding in Bond, however, does not apply so broadly and, indeed, does not undermine the well-established principle that legislatures may discipline members for speech with the corollary immunity from executive or judicial reprisal for doing so.

Bond did not even address the power of legislatures to discipline members, but rather involved a question of whether the Georgia legislature could refuse to seat members-elect in the first place. See id. at 118. The Georgia legislature refused to seat Julian Bond, based on the perception that he was not able to swear sincerely to uphold the state and federal constitutions. See id. at 123. The Supreme Court concluded that the requirement of taking an oath "does not authorize a majority of state legislators to test the sincerity with which another duly elected legislator can swear to uphold the Constitution." Id. The holding in Bond establishes the principle more exhaustively analyzed three years later in Powell v. McCormack, 395 U.S. 486 (1969), that members-elect must be seated if they meet constitutionally enumerated qualifications. See id. at 553 n.7 (Douglas, J., concurring) (citing Bond). In Powell, after surveying English history, the colonial experience, the constitutional convention, the ratification debates, and the post-ratification practice, the Court concluded that the legislative power to judge the qualifications of members-elect permits exclusion only on the basis of enumerated qualifications. See id. at 521-48.

9

Whitener seeks to transform the narrow holdings of <u>Bond</u> and <u>Powell</u> to imply that legislative censure is unconstitutional if motivated by something the member said. But he provides no authority for the proposition, and long practice indicates otherwise. "Congress frequently conducts committee investigations and adopts resolutions condemning or approving of the conduct of elected and appointed officials, groups, corporations, and individuals. Members often vote to do so, at least in part, because of what the target of their investigation or resolution has said." <u>Zilich v. Longo</u>, 34 F.3d 359, 363 (6th Cir. 1994). Indeed, as the well-documented history of the speech and debate privilege reveals, the privilege was an assertion of the legislature's <u>exclusive</u> jurisdiction to punish speeches made in the course of legislative business. Indeed, that power, which exists to protect the public reputation of legislative bodies and to make orderly operation possible, has been exercised on at least two occasions to censure United States Senators for speech that the Senate deemed inappropriate. <u>See</u> IV Robert C. Byrd, <u>The Senate: 1789-1989</u> 671 (1993) (recalling that Timothy Pickering was censured in 1811 for reading documents in the Senate before an "injunction of secrecy" was removed and that Benjamin Tappan was censured in 1844 for leaking the President's message on a treaty to the press).

Finally, Whitener's expansive interpretation of <u>Bond</u> flies in the face of the Supreme Court's decision in <u>Tenney v. Brandhove</u>. In <u>Tenney</u>, the Supreme Court applied absolute legislative immunity even though Brandhove alleged that the hearings in question were intended "to intimidate and silence [him] and deter and prevent him from effectively exercising his constitutional rights of free speech and to petition the Legislature for redress of grievances." 341 U.S. at 371. Whitener alleges similarly that the Loudoun County Board of Supervisors retaliated against him for his speech. To allow Whitener's case to proceed in court would require us to ignore the legislative body's exclusive right, as articulated in <u>Tenney</u>.

Even if, at some level, there is a judicially enforceable First Amendment constraint on a legislature's power to discipline one of its members, we certainly do not approach it in this case. Whitener was disciplined for his lack of decorum, not for expressing his view on policy. We cannot conclude that the Loudoun County Board of Supervisors was without power to regulate uncivil behavior, even

10

though it did not occur during an official meeting. Such abusiveness, even when it occurs "behind the scenes," can threaten the deliberative process. Indeed, "[t]he greatest concern over speech within a deliberative body is that members might engage in personal invective or other offensive remarks that would unleash personal hostility and frustrate deliberative consideration." Bogen, Origins , at 436 (citing M. Clarke, Parliamentary Privilege in the American Colonies 190-94 (1971)).

IV

Because we conclude that the Loudoun County Board of Supervisors acted in a legislative capacity when it voted to discipline Whitener, its action is protected by absolute legislative immunity. We therefore affirm the judgment of the district court.*

AFFIRMED

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

Respectfully, I dissent. Because Whitener's removal from his com-

_____

*By separate order, we have denied the Board's motion to dismiss this appeal as moot. Neither party argued the point below or in their briefs on appeal, and the issue arose only during oral argument on an inquiry from the court. While the record therefore is not fully developed, we agree with Whitener that interim events have not completely and irrevocably eradicated the effects of the Board's discipline. See County of Los Angeles v. Davis, 440 U.S. 625, 630 (1979). The Board voted that Whitener be formally censured and stripped of his ability to serve and vote on any of Loudoun County's standing committees and county commissions for a period of one year. While the year has now passed and Whitener has been made a member of some committees, he asserts that he "has still not been reinstated in his previous committee chairmanships, committee assignments and county commissions," having only been allowed to serve "in a minor capacity on several of Loudoun County's less influential standing committees." He claims also that he "has not been awarded compensation for the court costs and legal fees" he has incurred. And finally, the stigma of formal censure remains. For purposes of the Board's motion, therefore, we can only assume that effects of discipline have not yet been completely and irrevocably eradicated.

11

mittee assignments ended on February 7, 1997, this appeal is now moot. Accordingly, I would dismiss it.

Under Article III of the United States Constitution, federal courts may consider only cases or controversies. See S.E.C. v. Medical Com. for Human Rights, 404 U.S. 403, 407 (1972) (citing Liner v. Jafco, Inc., 375 U.S. 301, 306 n.3 (1964). Once an appeal becomes moot -- when it no longer presents any "live" issues-- we lack jurisdiction over it. Powell v. McCormack, 395 U.S. 486, 496 (1969). It is well-established that "federal courts may not `give opinions upon moot questions or abstract propositions.'" Calderon v. Moore, 116 S. Ct. 2066, 2067 (1996) (quoting Mills v. Green, 159 U.S. 651, 653 (1895)). Nor is it sufficient that there may have been a "live" case or controversy when the case was before the lower court. Burke v. Barnes, 479 U.S. 361, 363 (1987) (citing Sosna v. Iowa, 419 U.S. 393 (1975)). Here, Whitener sought to enjoin the Board of Supervisors from enforcing a one-year bar on his participation in its standing committees. As that one-year bar expired on February 7, 1997, Whitener no longer has a "live" dispute with the Board that satisfies the case or controversy requirement.

Alejandrino v. Quezon, 271 U.S. 528 (1926), directly addresses Whitener's situation. A member of the Philippine Senate, Alejandrino sought mandamus and an injunction against that body after he had been expelled for one year. Ironically, like Whitener, he was accused of angrily confronting another legislator after legislative proceedings and outside the chambers. On appeal, the Supreme Court found the case moot, reasoning:

> We do not think that we can consider this question, for the reason that the period of suspension fixed in the resolution has expired, and, so far as we are advised, Alejandrino is now exercising his functions as a member of the Senate. It is therefore in this Court a moot question whether lawfully he could be suspended in the way in which he was.

Alejandrino, 271 U.S. at 532.

The same conclusion must be reached here. Whitener has already received the redress that he sought, namely, reinstatement to Board

12

standing committees. His suggestion that his appeal is not moot because his new committee assignments differ from those he previously held is meritless in view of the fact that, as Whitener conceded at oral argument, the Board has the ability to reconstitue standing committees on a yearly basis as it chooses.

Similarly, Whitener's assertion that his appeal should not be found moot because "there exists a reasonable expectation and probability that the violations complained of in this appeal will recur" is no more persuasive. There is absolutely nothing in the record to indicate that the Board will impose another one-year punishment on Whitener; and just as the Supreme Court in Alejandrino chose not to speculate on future bases of jurisdiction, so should we. What Whitener really seems to want is to litigate other, recently occurring, allegedly wrongful conduct by the Board. That course is not open to him here -- he cannot on appeal make claims never pled or even existing when this suit was filed and considered by the district court. Moreover, these asserted "new" violations can and will be addressed in ongoing litigation that has been initiated by the Board against Whitener through the Virginia state court system.

Finally, since we lack jurisdiction to consider a moot claim, the fact that the parties did not address mootness in their initial briefs, but only in making and responding to a motion to dismiss on mootness grounds, does not in any way prevent us from addressing mootness. See Powell, 395 U.S. at 497 n.9 (observing that in Alejandrino the parties did not brief mootness).

For all of these reasons, I believe Whitener's appeal is moot and should be dismissed on that ground.

13