TATEL, Circuit Judge,
concurring.
Though disappointed at our failure to reach consensus in this important case, I take some solace from the fact that the commonalities of our opinions exceed their differences — differences that relate to questions more easily answered after further factual development. I write separately to point out the commonalities, to briefly discuss the differences, and to suggest how the cases should proceed on remand.
First, the commonalities. All of us agree that Browning v. Clerk, U.S. House of Representatives, 789 F.2d 923 (D.C.Cir.1986), extends further than the Speech or Debate Clause requires. See Op. of Judge Randolph 11; Op. of Judge Brown 25; Op. of Judge Rogers 17. All of us also agree, however, that the Speech or Debate Clause still has some role to play in employment discrimination cases, Op. of Judge Randolph 14; Op. of Judge Brown 30; Op. of Judge Rogers 17, and that the question of what precisely the Clause precludes is best resolved on a case-by-case basis, Op. of Judge Randolph 15-17; Op. of Judge Brown 31-32; Op. of Judge Rogers 17-18. And all of us agree that the two district court orders should be affirmed.
What, then, divides us? After dispensing with Browning, the two principal opinions diverge. Judge Randolph’s opinion for the court holds that because neither of *19 the cases before us rests on legislative acts, we have no basis for dismissing them. Judge Randolph then points out that the Speech or Debate Clause may preclude some evidence, that in many employment cases it may preclude the very evidence upon which plaintiffs seek to rely, and that if it does, the suit may not proceed. The principal concurrence focuses on whether the defendant functions as a Member’s alter ego, arguing that wide variations in Speech or Debate Clause protection hinge on the answer to that question. This approach would apply one version of the Speech or Debate Clause if the defendant is a Member’s alter ego and another if the defendant is not.
Not only do I find this distinction unworkable, but I do not understand what it means for a defendant to “be” a Member’s alter ego. No one acts as a Member’s alter ego all the time: even a Member’s primary legislative aide does not act as the Member’s alter ego when brushing her teeth. Whether an aide acted as a Member’s alter ego turns on the particular ad the aide performed on the Member’s behalf. Reinforcing this point, Gravel v. United States, the first case to have used the term “alter ego,” focuses on the aide’s actions: “the Speech or Debate Clause applies not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself.” 408 U.S. 606, 618, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972) (emphasis added); see also id. at 621-22, 92 S.Ct. 2614 (“the privilege applicable to the aide [must be] viewed ... as the privilege of the Senator, and invocable only by the Senator or by the aide on the Senator’s behalf, and ... in all events the privilege available to the aide is confined to those services that would be immune legislative conduct if performed by the Senator himself’ (footnote omitted) (emphasis added)); id. at 622, 92 S.Ct. 2614 (noting that an aide can testify “at trials or grand jury proceedings involving third-party crimes” only if “the questions do not require testimony about or impugn a legislative act”).
Of course, the person who performed the challenged action and the defendant in the litigation are often the same person (e.g., if the aide faces criminal or civil liability), so it is a convenient shorthand to say that only an alter ego can exercise the privilege to preclude litigation about particular conduct. But that shorthand refers to whether the person acted as the Member’s alter ego when performing the (possibly) legislative act at issue, not to whether the aide “is” an alter ego at the time of the litigation. Even language from Gravel, upon which the principal concurrence relies, comes from a section of the opinion emphasizing the conduct at issue over the defendant’s identity. The statement “relief could be afforded without proof of a legislative act or the motives or purposes underlying such an act,” id. at 621, 92 S.Ct. 2614, quoted in Op. of Judge Brown 31, appears in a paragraph beginning “[n]one of these three cases [Kilbourn v. Thompson, 103 U.S. 168, 26 L.Ed. 377 (1881), Dombrowski v. Eastland, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967), and Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)] adopted the simple proposition that immunity was unavailable to congressional or committee employees because they were not Representatives or Senators; rather, immunity was unavailable because they engaged in illegal conduct that was not entitled to Speech or Debate Clause protection,” Gravel, 408 U.S. at 620, 92 S.Ct. 2614.
Focusing on particular actions rather than on the defendant’s “status” as an alter ego suggests a simple rule: no Member or alter ego can be held liable for the *20 performance of a legislative act. As Judge Randolph points out, however, these cases do not implicate that rule because neither Fields nor Hanson must prove the performance of a legislative act in order to prevail. Op. of Judge Randolph 13.
But the Speech or Debate Clause does not end there. We all agree that the Clause also precludes introduction of certain evidence and that this aspect of the privilege will come into play in these cases if a Member or an appropriate aide asserts it. See id. at 16 (“The affiant ... must be able to assert a Member’s Speech or Debate Clause immunity.”); Op. of Judge Brown 32 (“[T]he Clause functions only as a testimonial and documentary privilege, to be asserted by members and qualified aides if they are called upon to produce evidence.”). Still, we differ on how broad a role the Clause plays. The principal concurrence suggests that so long as aides are neither producing the evidence nor defending the case, litigation can center on the motivation for legislative acts. See Op. of Judge Brown 31-32. According to Judge Randolph, the Speech or Debate Clause precludes litigation in which a plaintiff seeks to meet the McDonnell Douglas burden by challenging the veracity of an aide’s testimony about the motivation for legislative acts. See Op. of Judge Randolph 14-17 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Because judicial assessment of the aide’s testimony would constitute “inquiry into legislative acts or the motivation for actual performance of legislative acts,” United States v. Brewster, 408 U.S. 501, 509, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972), I agree with Judge Randolph.
To be sure, I might prefer a more limited view of the Speech or Debate Clause’s reach were I writing on a blank slate, but several Supreme Court decisions make clear that we must tread carefully in this area. See Op. of Judge Randolph 8 (citing cases). Indeed, “[rjather than giving the [Speech or Debate] Clause a cramped construction, the [Supreme] Court has sought to implement its fundamental purpose of freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator.” Gravel, 408 U.S. at 618, 92 S.Ct. 2614. For this reason, I believe we must leave it to the Supreme Court to narrow the Speech or Debate Clause’s reach. See Rodriguez de Quijas v. Shearson/Am. Exp., Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (“[T]he Court of Appeals should ... leav[e] to [the Supreme] Court the prerogative of overruling its own decisions.”).
Thus, although I agree that suits against congressional offices- — as authorized by the Congressional Accountability Act — place less pressure on Members than would suits against Members personally, I cannot agree that the Clause’s protection extends only to cases in which Members (or their aides) are witnesses or defendants. Nor do I share the principal concurrence’s confidence that CAA cases will not “unduly involve the judicial branch in the affairs of the legislative branch.” Op. of Judge Brown 29. Certainly the language from Gravel upon which the principal concurrence relies — “We do not intend to imply ... that in no grand jury investigations or criminal trials of third parties may third-party witnesses be interrogated about legislative acts of Members of Congress,” Gravel, 408 U.S. at 629 n. 18, 92 S.Ct. 2614, quoted in Op. of Judge Brown 31— stands for no such proposition; Gravel states only that some testimony about legislative acts by third-party witnesses may be admissible, not that all such testimony is admissible.
*21 For these reasons, I join Judge Randolph’s opinion. Still, I emphasize that despite our differences, we all agree that on remand the district courts must determine whether particular aspects of these two cases implicate Speech or Debate Clause concerns. In my view, the district courts should focus on determining whether the cases may proceed without undue judicial “inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts.” Brewster, 408 U.S. at 525, 92 S.Ct. 2531. Because such determinations will necessarily be fact-bound, it is appropriate that we announce no blanket rule today. Once the district courts develop the factual records, the issues that divide this court may become clearer.
BROWN, Circuit Judge, with whom SENTELLE and GRIFFITH, Circuit Judges, join, concurring in the judgment.
The Congressional Accountability Act of 1995 (the “Act”), 2 U.S.C. §§ 1301-1438, was the first legislation of the 104th Congress, adopted in the Senate by a vote of 98 to 1, and adopted unanimously in the House. Section 102(a) of the Act lists several federal laws that “shall apply ... to the legislative branch of the Federal Government,” including (1) the Fair Labor Standards Act of 1938, (2) Title VII of the Civil Rights Act of 1964, (3) the Americans with Disabilities Act of 1990, (4) the Age Discrimination in Employment Act of 1967, (5) the Family and Medical Leave Act of 1993, and (6) the Occupational Safety and Health Act of 1970. 2 U.S.C. § 1302(a). President Clinton described the Act as “a reform that requires Congress to live under the laws it imposes on the American people,” commenting that “Washington has too often isolated itself from the every day experience of ordinary Americans.” Remarks on Signing the Congressional Accountability Act of 1995, 31 Weekly Comp. Pres. Doc. 91, 91 (Jan. 22, 1995). In these cases, we address whether, and in what circumstances, the defendant in an action brought pursuant to the Act may assert the Speech or Debate Clause as a jurisdictional bar, thereby requiring summary dismissal of the action.
Our determination of this issue calls into question the framework we articulated in Walker v. Jones, 733 F.2d 923 (D.C.Cir.1984), and Browning v. Clerk, U.S. House of Representatives, 789 F.2d 923 (D.C.Cir.1986), concerning applicability of the Speech or Debate Clause in employment litigation involving congressional employees. I conclude that the rule stated in those cases distorts the Speech or Debate Clause beyond its natural contours, and therefore I, too, would repudiate it and refocus our analysis on the terms of the Constitution and the relevant statements of the Supreme Court, but I would approach the case in a somewhat different way than Judge Randolph.
I
A
Fields v. Office of Eddie Bernice Johnson, Employing Office, United States Congress, No. 04-5315: From January 2002 until March 2004, Beverly Fields was the chief of staff in the congressional office of Eddie Bernice Johnson, a member of the United States House of Representatives. On June 3, 2004, Fields brought an employment discrimination action under the Act, naming the “Office of Eddie Bernice Johnson” as the defendant as section 408 of the Act requires. See 2 U.S.C. § 1408. In her amended complaint, Fields claims the office actively sought an Asian person under the age of forty to replace a dark-skinned Latino employee. When the office selected a suitable Asian employee, it terminated the Latino employee, giving the *22 employee only one day’s notice. Fields objected and asked the office to allow the Latino employee to continue working for two more months, but the office allegedly rejected this request. About the same time, according to the complaint, the office began efforts to replace Fields, who is African American, with a white man. To that end, the office allegedly made false accusations against Fields regarding her job performance and her relationships with coworkers and then demoted Fields by taking away her supervisory responsibilities. Fields claims the demotion was based on her race and gender and that it was also in retaliation for her having intervened on behalf of the Latino employee. In addition, Fields alleges discrimination in regards to pay. Finally, Fields claims the office initiated a bad faith investigation of her conduct as an employee, seeking thereby to force her to resign, and when Fields refused to resign, the office allegedly terminated her. Fields claims the investigation and subsequent termination were retaliatory.
The office moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1), claiming lack of jurisdiction based on the Speech or Debate Clause. According to a declaration filed by the office, Fields was integrally involved in executing Johnson’s legislative agenda. Though many of her duties were administrative, Fields was also involved in formulating legislative strategy, advising Johnson on how to vote, approving Johnson’s floor statements, drafting legislation, and conferring with staff of other legislative offices about various legislative initiatives.
On August 25, 2004, the district court denied the motion to dismiss in a two-line order, which stated no reasons, and on August 27, 2004, the office filed this interlocutory appeal.
B
Hanson v. Office of Senator Mark Dayton, No. 04-5335: From January 2001 until September 2002, Brad Hanson held various positions in the congressional office of Mark Dayton, a member of the United States Senate. Throughout this time, Hanson was located in Fort Snelling, Minnesota. On May 29, 2003, Hanson brought an employment discrimination action under the Act, naming the “Office of Senator Mark Dayton” as the defendant. See 2 U.S.C. § 1408. In his complaint, Hanson claims he was hired as a “State Office Manager.” His job allegedly involved setting up three local offices in Minnesota and overseeing a “Health Care Help Line,” which assisted people with their healthcare coverage problems. He alleges he worked consider-able overtime, for which he was not paid. In 2002, according to the complaint, Hanson developed a medical condition that required surgery and a few weeks’ recovery time. Hanson claims he met with Dayton on July 3, 2002, to tell Dayton of his need for this surgery. Five minutes into the meeting, Dayton allegedly said, ‘You’re done,” and he told Hanson he should no longer report to the office and should instead go on immediate medical leave. On July 17, 2002, a senior staff member allegedly called Hanson at home and told him he would be terminated as of September 30, 2002. The complaint alleges Dayton fired Hanson because Hanson needed time off to recover from surgery, in violation of the Family and Medical Leave Act of 1993, and also because Dayton erroneously perceived Hanson to be disabled, in violation of the Americans with Disabilities Act of 1990. The complaint further alleges that the failure to compensate Hanson for overtime violated the Fair Labor Standards Act of 1938.
*23 The office moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1), claiming lack of jurisdiction based on the Speech or Debate Clause. According to a declaration filed by the office, Hanson’s work included meeting with constituents, briefing the Senator on constituent concerns regarding healthcare and law enforcement, overseeing the “Health Care Help Line,” and identifying possible legislative initiatives. The declaration asserts that Hanson’s work enabled him to identify a problem regarding reimbursements to ambulance service providers, and it claims Hanson was part of a team that investigated this problem and advised Dayton, proposing legislative solutions. As a result of this advice, Dayton introduced a bill entitled the Medicare Ambulance Payment Reform Act of 2001, and Dayton also initiated a committee hearing to address this issue. The declaration states that Hanson helped plan the committee hearing, selected topics and witnesses, and developed questions for Dayton to ask at the hearing.
Hanson responded to this declaration with his own declaration stating that the office “exaggerates my role in legislation” and “[ojverall, I estimate that I did not spend more than five percent of my time on the type of legislative duties described in Senator Dayton’s motion.”
On September 7, 2004, the district court denied the motion to dismiss in a minute order, which stated no reasons, and on September 21, 2004, the office filed this interlocutory appeal.
C
In most circumstances, our jurisdiction to hear appeals from district court orders only extends to “final decisions.” 28 U.S.C. § 1291. Under the collateral order doctrine, we also have jurisdiction to hear immediate appeals of certain interlocutory orders, see Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), namely those orders that “conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and [are] effectively unreviewable on appeal from a final judgment,” Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). Such orders must “present[ ] a serious and unsettled question” to be immediately ap-pealable. Cohen, 337 U.S. at 547, 69 S.Ct. 1221. “[T]he denial of a substantial claim of absolute immunity is an order appeal-able before final judgment, for the essence of absolute immunity is its possessor’s entitlement not to have to answer for his conduct in a civil damages action.” Mitchell v. Forsyth, 472 U.S. 511, 525, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). This framework applies to claims of immunity under the Speech or Debate Clause. See, e.g., Helstoski v. Meanor, 442 U.S. 500, 506, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979). Because we have not yet had occasion to determine whether the personal offices of members of Congress may assert the protections of the Speech or Debate Clause, these cases present “serious and unsettled” questions arising out of “substantial” claims of absolute immunity. We therefore have jurisdiction to consider these appeals under the collateral order doctrine.
II
The Constitution provides: “[F]or any Speech or Debate in either House, [the Senators and Representatives] shall not be questioned in any other Place.” U.S. Const. art. I, § 6, cl. 1. The historical record does not indicate any debate or controversy with respect to this provision. Very similar provisions appear in the Articles of Confederation and the English Bill of Rights of 1689. The Clause has its *24 roots in centuries of struggle between the English Parliament and the Crown— struggle that sometimes erupted in armed conflict, with both Parliament and the Crown commanding independent armies. In more than one instance, royal troops arrested or attempted to arrest members of Parliament in reaction to speeches made and actions taken in Parliament. Coming in response to these confrontations, the Bill of Rights of 1689 established a bedrock legal foundation for the freedom of ideas within Parliament. Nearly a hundred years later, the Speech or Debate Clause established the same principle in American government. As the Supreme Court has explained, “the purpose of the Speech or Debate Clause is ... to preserve the independence and thereby the integrity of the legislative process.” United States v. Brewster, 408 U.S. 501, 524, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972).
[T]he privilege was ... born primarily of a desire ... to prevent intimidation by the executive and accountability before a possibly hostile judiciary.... There is little doubt that the instigation of criminal charges against critical or disfavored legislators by the executive in a judicial forum ... is the predominate thrust of the Speech or Debate Clause.
United States v. Johnson, 383 U.S. 169, 181-82, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966).
The Supreme Court first interpreted the Speech or Debate Clause in Kilbourn v. Thompson, 103 U.S. 168, 26 L.Ed. 377 (1881). Kilbourn involved a false imprisonment claim based on the plaintiffs arrest by the Sergeant at Arms of the House of Representatives. Id. at 170. The Sergeant at Anns was acting pursuant to a contempt finding of the House, id. at 176-77, but the Supreme Court ruled the contempt finding improper, id. at 199—200. While the Court allowed the false imprisonment action against the Sergeant at Arms to proceed, it concluded that House members could claim immunity under the Speech or Debate Clause. Id. at 200-05. The Court adopted a principle of liberal construction as regards the Clause, extending its scope to legislative votes, reports, committee proceedings, and ‘“everything said or done ... as a representative, in the exercise of the functions of that office.’ ” Kilbourn, 103 U.S. at 203 (quoting Coffin v. Coffin, 4 Mass. 1, 27 (1808)).
Though Kilbourn made clear that the reach of the Speech or Debate Clause extends beyond a literal reading of its terms, several later Supreme Court decisions have carefully circumscribed the scope of the clause, holding that it applies only to core legislative acts, not incidental or peripheral activities of congressional offices. For example, in Brewster, the Supreme Court concluded that the Speech or Debate Clause “prohibits inquiry only into those things generally said or done in the House or the Senate in the performance of official duties and into the motivation for those acts.” 408 U.S. at 512, 92 S.Ct. 2531. The Court rejected a rule that anything “in any way related” to the legislative process was privileged, id. at 516, 92 S.Ct. 2531, and it listed a variety of “political” activities that are not privileged, such as “ ‘errands’ performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called ‘news letters’ to constituents, news releases, and speeches delivered outside the Congress,” id. at 512, 92 S.Ct. 2531. See also Hutchinson v. Proxmire, 443 U.S. 111, 131, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). .
In Gravel v. United States, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), decided the same day as Brewster, the Supreme Court considered whether the *25 clause protected the private publication of classified gwernment documents. Senator Mike Gravel had placed the classified documents into the public record of a subcommittee meeting, but the Court concluded that a subsequent arrangement for private publication of the documents was not a protected legislative act. Id. at 625-26, 92 S.Ct. 2614. The Court described the clause as covering only matters “integral [to] the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.” Id. at 625, 92 S.Ct. 2614. The Court then added that the protection “extend[s] ... beyond pure speech or debate ..., but only ivhen necessary to prevent indirect impairment of such deliberations.” Id. (emphasis added, internal quotation marks and citation omitted). In other words, the Court’s relatively broad formulation of the Clause’s scope was cab-ined by the requirement that the Clause should only apply to the extent necessary to protect actual speech or debate.
Unlike the Supreme Court, we have interpreted the Speech or Debate Clause in the employment litigation context. In Walker, 733 F.2d at 934, we held that the Clause permitted a general manager of the House restaurant to sue for sex discrimination. In that case, we posited a distinction between “staff ... who help prepare for hearings or assist in the composition of legislative measures” and those who provide “[a]uxiliary services attending to human needs,” and we held that the latter group are not “ ‘legislative’ in character.” Id. at 931. Judge MacKinnon concurred in part and dissented in part, arguing that the Speech or Debate Clause immunizes members of Congress from liability with respect to all employment decisions so long as those decisions are treated as legislative by Congress itself. Id. at 938 (MacKinnon, J., concurring and dissenting). Judge MacKinnon expressly rejected the court’s measurement of Congress’s actions against “some Platonic ideal of the ‘legislative’ process,” arguing that Congress itself defines what is a legitimate subject of legislative decisionmaking. Id. In this regard, Judge MacKinnon noted that the restaurant manager had been terminated on the authority of a vote taken by a congressional subcommittee. Id. at 941-43.
Two years later, in Browning, 789 F.2d 923, we held that the Speech or Debate Clause precluded any “judicial scrutiny” into the discharge of a House reporter whose job was to transcribe committee proceedings, id. at 924, and therefore it immunized Congress, its members, and their aides from liability, id. at 931. The court distinguished Walker on the ground that Walker involved an employee whose duties were not “directly related to the due functioning of the legislative process.” Id. at 929 (emphasis omitted). The court articulated the following rule: “Where the duties of the employee implicate Speech or Debate Clause concerns, so will personnel actions respecting that employee.” Id. at 928. Put another way, “[personnel decisions are an integral part of the legislative process to the same extent that the affected employee’s duties are an integral part of the legislative process.” Id. at 928-29.
The line we drew in Walker and Browning, focusing on the complaining employee’s duties, has some superficial appeal; its glaring flaw, however, is that it lacks any basis in the Speech or Debate Clause. Moreover, by defining very broadly the type of duties that might constitute “an integral part of the legislative process”— even including within that definition a House reporter who lacked discretionary *26 authority — we gave the immunity an unduly expansive scope. A rule of decision that more closely reflects the language and purpose of the Speech or Debate Clause would need to focus on the subject matter of the employee’s lawsuit and the evidence the parties would need to present to the court, because the complaining employee’s duties are an imperfect metric for probing whether the lawsuit will in fact force the court to inquire into protected matters. For example, even if a complaining employee’s duties are central to the legislative process, as in the case of an employee who drafts legislation and floor speeches, the employee’s lawsuit may turn factually on a series of overt requests for sexual favors and crude remarks, and therefore it may have nothing to do with the member’s legislative activities. In short, by focusing on the duties of the complaining employee, Walker and Browning established a much broader immunity than necessary to protect legislative independence, and nothing in the Speech or Debate Clause or the Supreme Court’s precedents compelled this broad immunity. Therefore, like Judge Randolph, Op. of Judge Randolph 12, I also would repudiate the reasoning used in Walker and Browning and proceed to the issue before us without the constraint of the framework imposed by those precedents.
III
In enacting the Congressional Accountability Act, Congress in effect sidestepped Browning’s broad formulation of immunity by designating the “employing office,” rather than the member, as the defendant. 2 U.S.C. §§ 1301(9), 1408(b). Nevertheless, appellants in the two cases before us argue that the “employing office” can invoke the Speech or Debate Clause on behalf of the member and thereby gain the benefit of the privilege. I reject this view.
First, it seems highly implausible, in light of Congress’s unambiguous intention to open itself to liability under federal employment laws, that Congress designated a defendant that could invoke the member’s Speech or Debate Clause rights. Why would Congress go to the trouble of designating the employing office as the defendant merely to create a bureaucratic redundancy able to assert the same privileges as the member?
Second, the Supreme Court has determined that a member’s aide is permitted to invoke the Clause on the member’s behalf because the aide acts as an alter ego of the member, working under the member’s authority and subject to his direction. Gravel, 408 U.S. at 616-18, 92 S.Ct. 2614. The same cannot be said of the employing office. This second point requires us to analyze exactly what the “employing office” is. Unfortunately, the law is not as clear in this regard as it could be, but it is at least clear enough to say what the employing office is not; it is not an alter ego of the member.
The Act defines the “employing office” as
(A) the personal office of a Member of the House of Representatives or of a Senator; (B) a committee of the House of Representatives or the Senate or a joint committee; (C) any other office headed by a person with the final authority to appoint, hire, discharge, and set the terms, conditions, or privileges of the employment of an employee of the House of Representatives or the Senate; or (D) [various specifically named offices within the legislative branch].
2 U.S.C. § 1301(9). For purposes of the cases before us, an “employing office” is the personal office of a member.
The personal office of a member, however, is not an independent legal entity, nor *27 does it have any independent interests. It is not a person, nor a sovereign government, nor a branch of government, nor an agency created by statute, nor a chartered corporation, nor a trust, nor a partnership.[1] It is an organizational division within Congress, established for Congress’s administrative convenience, analogous to a department within a large corporation. Therefore, an employee in the personal office of a member is in truth an employee of Congress, as to whom the member (acting on behalf of Congress) has supervisory control.
Title 2 of the United States Code is entitled “The Congress,” and it deals generally with the administrative organization of Congress. Chapter 4 of Title 2, entitled “Officers and Employees of Senate and House of Representatives,” governs employment-related administrative issues. Nothing in chapter 4 suggests that employees in member offices are anything other than congressional employees, or that member offices are anything other than administrative divisions within the two Houses of Congress. It is certainly true that Congress has chosen to adopt an administrative structure that gives great independence to its members. For example, each member of the Senate has a budget for employee compensation, 2 U.S.C. § 61-1(d)(1)(A); within the limits of that budget, “Senators may fix the number and the rates of compensation of employees in their respective offices” and “[a] Senator may establish such titles for positions in his office as he may desire to designate, by written notification to the disbursing office of the Senate,” id. § 61-1(d)(2). Nevertheless, salary payments to these employees are administered centrally by the Secretary of the Senate. Id. § 60c-l. Similarly, members of the House of Representatives are authorized to employ as many as 18 permanent employees, id. § 92(a), but again, salary payments are administered centrally by the Chief Administrative Officer of the House of Representatives, id. §§ 60d-1, 95-1.
Thus, Congress has delegated to its individual members discretion in hiring, firing, and managing employees in their personal offices, but it did not make each of those offices into an independent government agency, and the employees remain employees of Congress as a whole. Congress could certainly choose to structure its administrative affairs in a different manner and may decide that stricter branch-wide personnel policies are warranted in order to limit violations of the Act. In any case, *28 its current supervisory structure does not imply that the personal offices of its members are anything other than convenient administrative divisions.
For this reason, if we are to be legally precise, we cannot speak in terms of the “office” of a member taking a particular personnel action, because the “office” of the member is not a legal person. If a member hires or fires a legislative aide, the member makes a decision on behalf of the Congress, exercising power Congress has delegated to the member. Cf. 2 U.S.C. § 1301(9)(C) (designating as an “employing office” “any other office headed by a person with the final authority” to make personnel decisions (emphasis added)). The office of the member only gains some sort of quasi-legal existence when a dispute rises to the level of a suit under the Act. Then, the complaining employee has no choice but to name the member’s office as the defendant because that is precisely what the Act instructs the employee to do. Id. § 1408(b). In sum, the “employing office” exists as a prescribed label for the defendant in a lawsuit under the Act, and it has no prior existence as an independent entity that took any specific action against the employee.
Therefore, though Congress has expressly designated the employing office as the name of the defendant, the question remains: Who is the real defendant behind the name? The answer to that question is not a simple one, but what is simple is that the member is not the real defendant, nor is the real defendant an alter ego of the member. First, Congress intended to subject the legislative branch to liability for violation of federal employment laws, not to subject its members personally to such liability. See id. § 1302. Second, Congress’s attorneys defend the action. See id. § 1408(d); see also James J. Brudney, Congressional Accountability and Denial: Speech or Debate Clause and Conflict of Interest Challenges to Unionization of Congressional Employees, 36 Harv. J. on Legis. 1, 10 n.46 (1999). Third, Congress’s Office of Compliance has final settlement authority. See 2 U.S.C. § 1414. Fourth, funds appropriated to Congress’s Office of Compliance pay any settlement or judgment. See id. §§ 1381(a), 1415(a).
Moreover, nothing in the Act suggests that the member can make final litigation decisions on behalf of the employing office. It is true that the Executive Director of the Office of Compliance only has authority to approve or reject settlements “entered into by the parties,” id. § 1414, implying that the employing office separately negotiates the settlement. However, it is not clear that the employing office would be under the direction of the member in this regard, especially because the member arguably has a personal interest in the litigation that is at odds with that of the employing office. Furthermore, this provision at most gives the member, acting as Congress’s agent, an active role in the litigation; it clearly leaves the Office of Compliance as the final decisionmaker. It is also true that the Office of Compliance is to some extent an independent office within the legislative branch, subject to limited congressional oversight, id. § 1381, but if the Office of Compliance is not directly within Congress’s control, it is certainly not within the member’s control.
In short, the “employing office” is nothing like a member’s aide, who can invoke the Speech or Debate Clause privilege on the member’s behalf. Rather, by way of the Act, Congress sought to subject the legislative branch as an institution to federal employment laws. Id. § 1302(a). Cf. Bastien v. Office of Senator Ben Nighthorse Campbell, No. 01-cv-799, 2005 WL 3334359, at *4 (D.Colo. Dec.5, 2005) (“[T]he term ‘employing office’ actually re *29 fers to Congress and Congress is the responsible entity under the CAA.”), quoted in 454 F.3d 1072, 1073 (10th Cir.2006). Even if it is not quite apt to describe the “employing office” as an alter ego of Congress, it is far less appropriate to describe it as an alter ego of the member.[2] Most accurately put, the “employing office” is an administrative division within Congress, designated to be named as the defendant in these actions. Nothing in that status suggests that an employing office can invoke a member’s Speech or Debate Clause rights.
In addition, because the defendant in these suits is so differently situated than a member’s aide, there is little reason to believe that allowing these suits to proceed will threaten legislative independence or unduly involve the judicial branch in the affairs of the legislative branch. Of course, the precise rationale of the Supreme Court in Gravel — that aides must be treated as members’ alter egos because “the day-to-day work of such aides is so critical to the Members’ performance,” Gravel, 408 U.S. at 616-17, 92 S.Ct. 2614— does not apply here because, under the Act, the employing office serves no role in a member’s daily legislative work, functioning only as a defendant in employment suits. Nevertheless, Gravel also requires the court to extend Speech or Debate Clause protection if failing to do so “will inevitably ... diminish[ ] and frustrate[ ]” the Clause’s purpose of “prevent[ing] intimidation of legislators by the Executive and accountability before a possibly hostile judiciary,” id. at 617, 92 S.Ct. 2614, or if “judicial oversight ... realistically threatens to control [a member’s] conduct as a legislator,” id. at 618, 92 S.Ct. 2614. I do not believe, however, that the limited judicial oversight the Act permits will contravene these standards.
To begin, the pressures the Act places on the member are slight: The member bears no financial risk — either from a judgment or attorneys’ fees. The member, through invocation of the evidentiary privilege, which I discuss below, can avoid distractions by refusing to testify or provide evidence regarding legislative acts. The member may face some embarrassment by having his or her personnel decisions placed under the micro-scope, but little more than he would due to any other publicity-generating event. The conduct at issue in these suits must be considered to be at or beyond the outer edge of what is “integral [to] the deliberative and communicative processes by which Members participate in committee and House [or Senate] proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.” Id. at 625, 92 S.Ct. 2614; cf. Forrester v. White, 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). Taken together, these considerations suggest that suits under the Act against the employing office do not “realistically threaten[ ] to control [a member’s] conduct as a legislator.” Gravel, 408 U.S. at 618, 92 S.Ct. 2614.
Thus, I see no reason to conclude that the employing office in an action brought *30 pursuant to the Act is entitled to invoke the Speech or Debate Clause, either on its own behalf or on behalf of a member. Clarifying this point is critical because it establishes that appellants in these cases cannot assert the Clause as a jurisdictional bar, regardless of whether the actions are predicated on legislative acts, and it also impacts how the Clause applies as an evi-dentiary rule.
Under the Supreme Court’s cases, the Speech or Debate Clause often operates as an immunity from suit — or, more precisely, as a jurisdictional bar depriving courts of the power to hear the suit. In Dombrowski v. Eastland, 387 U.S. 82, 85, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967), for example, the Court stated that, when the Speech or Debate Clause applies, members of Congress “should be protected not only from the consequences of litigation’s results but also from the burden of defending themselves.” Id. at 85, 87 S.Ct. 1425 (emphasis added). Similarly, in Gravel, the Court said that members of Congress are “shielded by the Speech or Debate Clause both from liability for their illegal legislative act and from having to defend themselves with respect to it.” 408 U.S. at 620, 92 S.Ct. 2614. And, in Doe v. McMillan, 412 U.S. 306, 318, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), the Court stated that certain acts “may not serve as a predicate for a suit” against members and aides, requiring dismissal of the complaint. Appellants here hope to gain the benefit of this jurisdictional bar, but allowing the suits to proceed will not force the members of Congress to bear the burden of defending the suits, nor will it subject the members to civil or criminal liability that might undermine their independence as legislators. Because appellants are not members of Congress, or alter egos of members, and therefore have no Speech or Debate Clause protection, the jurisdictional bar is not applicable.[3]
That conclusion does not, however, suggest the Clause can play no part in these actions. The Supreme Court has also articulated an evidentiary application of the Speech or Debate Clause for those cases not requiring dismissal of the complaint on jurisdictional grounds. In Brewster, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507, the Court stated that “a Member of Congress may be prosecuted under a criminal statute provided that the Government’s case does not rely on legislative acts or the motivation for legislative acts.” Id. at 512, 92 S.Ct. 2531. Applying this rule, the Court permitted a bribery prosecution of a member of the Senate to go forward, because the prosecution focused only on whether the member received compensa *31 tion in exchange for a promise to vote a certain way, and not on how the member actually voted or why. Id. at 525-27, 92 S.Ct. 2531. Hence, the Court concluded that no “inquiry into a legislative act or the motivation for a legislative act [is] necessary to a prosecution under this statute or this indictment.” Id.
In United States v. Helstoski, 442 U.S. 477, 99 S.Ct. 2432, 61 L.Ed.2d 12 (1979), the court made clear that the holding in Brewster — permitting criminal prosecutions that do not rely on proof of legislative acts or the motives for such acts— should be applied as an evidentiary rule governing proceedings at trial. Helstoski concerned a criminal prosecution of a former member of the House in relation to “allegations that aliens had paid money for the introduction of private bills which would suspend the application of the immigration laws so as to allow them to remain in this country.” Id. at 479, 99 S.Ct. 2432. The Supreme Court instructed the trial court to apply the Speech or Debate Clause as a rule of evidence: “[Johnson and Brewster ] leave no doubt that evidence of a legislative act of a Member may not be introduced by the Government in a prosecution ....” Id. at 487, 99 S.Ct. 2432. “Nothing [however] in our opinion ... prohibits excising references to legislative acts, so that the remainder of the evidence would be admissible.” Id. at 488 n. 7, 99 S.Ct. 2432. “As to what restrictions the Clause places on the admission of evidence, ... [the Court’s] concern is whether there is mention of a legislative act.” Id. at 490, 99 S.Ct. 2432.
In Gravel, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583, as already discussed, the Court extended Speech or Debate Clause protections to congressional aides. The Court distinguished Kilbourn, noting that in Kilbourn (and other cases permitting civil actions against aides), “relief could be afforded [against the aide] without proof of a legislative act or the motives or purposes underlying such an act.” Id. at 620-21, 92 S.Ct. 2614. By contrast, if the lawsuit requires proof of a legislative act or the motive for such an act, then the aide can assert the Speech or Debate Clause protections. Id. at 621-22, 92 S.Ct. 2614. Notably, the Court clarified in a footnote that its holding did not apply to cases in which the defendant was neither a member of Congress nor an alter ego of a member: “We do not intend to imply, however, that in no grand jury investigations or criminal trials of third parties may third-party witnesses be interrogated about legislative acts of Members of Congress.” Id. at 629 n. 18, 92 S.Ct. 2614 (emphasis added).
The cases now before us present the situation contemplated in the footnote in Gravel, because the defendants in these cases are neither members of Congress nor aides of members, and as the Gravel footnote suggests, this fact is significant as regards the evidentiary application of the Clause.[4] In a civil or criminal suit against a member or an aide, any inquiry into legislative acts amounts to an impermissi *32 ble “question[ing],” in violation of the Speech or Debate Clause. See Helstoski, 442 U.S. at 489, 99 S.Ct. 2432; Brewster, 408 U.S. at 525, 92 S.Ct. 2531. This rule makes sense because, in order to defend the suit fully, the member or aide would have to respond to any evidence of legislative acts introduced against him, no matter the source of the evidence, and the member’s silence might work to his disadvantage. In these cases, on the other hand, the defendants are not members or aides but employing offices, entities that cannot themselves assert the protections of the Speech or Debate Clause. The purposes behind the Speech or Debate Clause are not implicated by an inquiry into legislative acts in such cases, as the suits threaten neither the independence of the legislature as a whole nor of the individual members. Because the members are not defendants, the suits do not burden them with defense costs nor place them at any risk of personal liability, and as long as members and their aides are not themselves “questioned,” an inquiry into legislative acts does not implicate the Speech or Debate Clause. Cf. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266-68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Thus, where the member is not a party, the Clause functions only as a testimonial and documentary privilege, to be asserted by members and qualified aides if they are called upon to produce evidence. We need not explore the precise contours of this privilege today; the district court may address these problems as they arise. Of course, when the privilege makes relevant evidence unavailable, the parties will have to present their cases as best they can without the evidence, as would occur in other instances when non-parties possess privileged information.
IV
The Supreme Court has liberally construed the Speech or Debate Clause, but it still remains tethered to its underlying purpose. Brewster, 408 U.S. at 516, 92 S.Ct. 2531. Its purpose is not to immunize Congress from all liability; rather, its purpose is to ensure free and unrestrained discussion, debate, and decision relating to legislative matters. We can always hypothesize long cause-and-effect chains by which remote events somehow affect legislative decisions, but these remote events were not the concern of the Framers of our Constitution when they included in that document a clause protecting legislative speech and debate. Rather, they were concerned with much more immediate threats to legislative independence. They were concerned that members of Congress would be arrested or held liable specifically on account of arguments they had voiced in the course of heated debates over pending legislative issues. Johnson, 383 U.S. at 182, 86 S.Ct. 749. They were concerned about the political rivalries that naturally arise among the several branches of government, rivalries that might cause a hostile executive or judiciary to harass a member of Congress who had been outspoken about some abuse of power. Id. at 179-81, 86 S.Ct. 749. In addressing these concerns, they did not intend “to make Members of Congress super-citizens,” Brewster, 408 U.S. at 516, 92 S.Ct. 2531, who could block all judicial inquiry into their personnel practices and workplace conduct.
Appellants in these actions are not members of Congress entitled to invoke the Speech or Debate Clause, nor are they alter egos of members. Therefore, the Speech or Debate Clause does not provide a basis for dismissing these actions; rather, it operates as an evidentiary protection *33 for members of Congress and their aides who might be asked to provide evidence in these actions. For these reasons, I agree that we should affirm the district court’s orders denying defendants’ motions to dismiss,

. The same, of course, might be said of a congressional committee, which would also qualify as an "employing office” under 2 U.S.C. § 1301(9). We are not here presented with a case involving a congressional committee as a defendant, but a committee arguably has a stronger claim to independent legal existence than a member's personal office in that a committee is formally established for certain express purposes and carries out actions in its own name, whereas a personal office exists only as a shell defendant to be sued under the Act. According to Judge Randolph, “the Supreme Court has held that legislative committees may invoke the [Speech or Debate] Clause.” Op. of Judge Randolph 13 n. 22 (citing Tenney v. Brandhove, 341 U.S. 367, 379, 71 S.Ct. 783, 95 L.Ed. 1019 (1951)). Tenney did not so hold. Tenney held that Congress did not intend 42 U.S.C. § 1983 to supplant common law principles of legislative independence by imposing possible civil liability on state legislative committees. See 341 U.S. at 376, 71 S.Ct. 783; see also Supreme Court of Va. v. Consumers Union of the United States, Inc., 446 U.S. 719, 732, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980). Judge Randolph also relies on Consumers Union of the United States, Inc. v. Periodical Correspondents’ Ass’n, 515 F.2d 1341 (D.C.Cir.1975). Consumers Union did not even involve a legislative committee as a defendant. Rather, it involved a private association, id. at 1345, that — like a legislative aide — acted on behalf of members of Congress, id. at 1350.

. Judge Tatel contends that "[w]hether an aide acted as a Member's alter ago turns on the particular act the aide performed on the Member's behalf.” Op. of Judge Tatel 19. Statutorily, a member's personal office only exists as a defendant to be sued under the Act. As the office is not an entity — actual or juridical — that can take actions, a fortiori it cannot act on behalf of the member, it is therefore precluded from qualifying as an alter ego of the member. Given that conclusion, I see no need to determine whether particular acts alleged in the complaint were "legislative,” as those acts were not performed by the office itself.

. Because I conclude that members' offices cannot assert the protections of the Speech or Debate Clause, I do not reach the subsequent questions of whether the acts alleged in the complaints in these cases are “legislative” and the jurisdictional significance of that determination. Cf. Op. of Judge Randolph 13. However, if the defendants here could assert the Speech or Debate Clause, I believe the jurisdictional application of the clause might be broader than Judge Randolph suggests. For the purposes of the Speech or Debate Clause to be fulfilled, it arguably ought to bar as a jurisdictional matter not only lawsuits in which the complaints are predicated on legislative acts, but also suits that will inevitably necessitate an inquiry into such acts and motivations, even where such inquiry would arise due to an affirmative defense. Cf. Davis v. Passman, 442 U.S. 228, 235 n. 11, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) ("Defenses based upon the Clause should thus ordinarily be given priority, since federal legislators should be exempted from litigation if their conduct is in fact protected by the Clause.” (emphases added)). If, for example, a member is a named defendant in a state law tort action alleging wrongful termination, limiting the member to an evidentiary application of the Clause seems too restrictive.

. Under Judge Randolph's approach, a "case can go forward” if it "does not inquire into legislative motives or question conduct part of or integral to the legislative process,” but should be dismissed if it would require any inquiry into legislative acts. Op. of Judge Randolph 16. While Judge Tatel purports to join Judge Randolph's opinion in full, he admits that, according to the Gravel footnote, at least some evidence of legislative acts may be admitted against third-party defendants. See Op. of Judge Tatel 20. Such a concession effectively undermines Judge Randolph's approach; the possibility of admitting such evidence means that many suits may proceed even if they would entail some inquiry into legislative acts.